UNITED STATES of America,
Plaintiff-Appellee,

v.

Fred A. SHELTON,
Defendant-Appellant.

No. 83–1805.

United States Court of Appeals,
Tenth Circuit.

June 11, 1984.

Certiorari Denied Oct. 1, 1984.
See 105 S.Ct. 185.

1398

Donn F. Baker, Asst. U.S. Atty., Musko-
gee, Okl. (Gary L. Richardson, U.S. Atty.,
Muskogee, Okl., with him on brief), for
plaintiff-appellee.

Jon Tom Staton, Muskogee, Okl. (Mike Norman and Don Pearson, Muskogee, Okl., with him on brief), for defendant-appellant.

Before SETH, Chief Judge, BARRETT, Circuit Judge, and SAFFELS *, District Judge.

BARRETT, Circuit Judge.

Fred A. Shelton (Shelton) appeals his jury conviction on thirty-seven (37) counts of mail fraud under 18 U.S.C. §§ 1341 and 2 and three (3) counts of extortion under 18 U.S.C. § 1951. The charges were brought against Shelton while he served as a county commissioner of Muskogee County, Oklahoma. He was charged under §§ 1341 and 2 with a scheme to defraud the citizens of the county by mail. The § 1951 charges accused Shelton of interference with interstate commerce by extortion. All of the acts charged were alleged to have occurred between 1978 and 1981. The Government was limited by the five-year limitation period contained in 18 U.S.C. § 3282.

This is one of approximately two hundred prosecutions of Oklahoma county commissioners which resulted from extensive investigations pursued over a three-year period by the Federal Bureau of Investigation, the Internal Revenue Service, and the United States Attorneys for Oklahoma.

Shelton was charged with defrauding the citizens of Muskogee County, Oklahoma, in two ways. The 18 U.S.C. §§ 1341 and 2 charges accused Shelton, in his capacity as county commissioner, of purchasing various materials and supplies for Muskogee County in exchange for "kickbacks" of ten percent from the vendors. The 18 U.S.C. § 1951 charges accused Shelton of causing vendor invoices to be paid for materials and supplies which were never in fact delivered to Muskogee County, whereby Shelton "split" the payment proceeds fifty-fifty with the vendors. These charges "fit the mold" of similar cases previously appealed to this Court.[1]

Shelton, age sixty-one at time of trial, had served twenty years as a Muskogee county commissioner. He was a good family man and had a good reputation in his community of Fort Gibson, Oklahoma, and in Muskogee County. He was a four-year combat veteran of World War II, having served in Europe with the 45th Division. He was a likable person. He served as one of three commissioners for Muskogee County whose main responsibility was to oversee the maintenance of county roads and bridges. These roads consist of both gravel and asphalt surfaces, totaling approximately 430 miles, maintained by motor patrols, graders, grader blades, loaders, trucks, distributors to shoot and spread oil, pneumatic rollers, sheep foot rollers, and a variety of materials, including culvert pipe, bridge timbers and road signs. (R., Vol. II at 722–24.) Shelton's duties included negotiating for the county's purchase of various materials and supplies in the maintenance of the county's roads and bridges. In the five-year period prior to trial, Shelton was alleged to have been part of a fraudulent scheme whereby county funds were expended for purported purchases of materials, supplies, and equipment effected by (1) actual purchases in exchange for "kickbacks" of ten percent from the vendors/sellers, or (2) placement of orders for items not to be delivered, whereby the payment by the county was split "fifty-fifty" between Shelton and the vendors.

The principal witnesses for the government were three vendors involved with Shelton in the alleged scheme. Joe Swank (Swank) was the operator of Port City Road Supplies from 1977 to 1979. Prior to

---

* Honorable Dale E. Saffels, United States District Court for the District of Kansas, sitting by designation.

**1.** *United States v. James,* 728 F.2d 465 (10th Cir.1984); *United States v. Lightle,* 728 F.2d 468 (10th Cir.1984); *United States v. Primrose,* 718 F.2d 1484 (10th Cir.1983); *United States v.*

*Whitt,* 718 F.2d 1494 (10th Cir.1983); *United States v. Gann,* 718 F.2d 1502 (10th Cir.1983); *United States v. Neal,* 718 F.2d 1505 (10th Cir. 1983); *United States v. Boston,* 718 F.2d 1511 (10th Cir.1983); *United States v. Thurber,* 709 F.2d 632 (10th Cir.1983); *United States v. Perry,* 709 F.2d 1348 (10th Cir.1983).

Shelton's trial, Swank had been similarly charged and had entered into a plea-bargain agreement with the United States Attorney. He was the first vendor to appear before the federal grand jury investigating the statewide "kickback" scandal. About a week before the Shelton trial, Swank had entered a plea of guilty to one count of conspiracy to commit mail fraud with Shelton. He testified that he had engaged in forty-one "kickback" transactions with Shelton involving Muskogee County funds whereby, after he received payment by county warrant, he in turn secretly remitted ten percent as a cash "kickback" to Shelton. Swank also testified that on one or two occasions he engaged in "split deals" with Shelton whereby Swank submitted vouchers, approved by Shelton, to Muskogee County for merchandise not delivered. When Swank cashed the warrant, he secretly delivered half of the money in cash to Shelton.

Swank, too, had a good reputation. He was a college graduate and former basketball coach at the University of Tulsa and at Sentinary College. A resident of Muskogee, Swank had served in the United States Air Force from 1943 to 1946. After coaching, he engaged in the grocery business at Fort Gibson and then entered the road supply business in north Muskogee under the partnership name of Port City Road Supplies. Swank did "kickback" business with county commissioners in six counties. (R., Vol. I at 172.) Swank had known Shelton for approximately thirty or thirty-five years. He testified that Shelton's reputation for truth and veracity was honorable and stated that they were friends. On redirect examination, Swank stated that if he had not paid Shelton the "kickback" monies, he would not have obtained any business from the county. (Id. at 213.) On recross-examination, Swank testified that he had dealt similarly with at least twelve commissioners in six counties, to whom he paid "kickbacks" of ten percent. (Id. at 214.)

James Joseph Skipper (Skipper) of Ada, Oklahoma, testified that as owner of a company located at Tupelo, Oklahoma, known as S & S Supply, he sold all types of bridge materials to Oklahoma county commissioners from 1975 until 1981, including culvert pipe, lumber, nails, grader blades and signs. (Id. at 230–31.) He stated that during this period, he paid "kickbacks" of ten percent on sales to about twenty county commissioners and participated in some fifty-fifty "splits" involving Muskogee, Cherokee and Pittsburg Counties. (Id. at 231–33.) Skipper specifically recalled doing business with Shelton in Muskogee County (District I). During the period in which Skipper was doing business as S & S Supply, he made a number of "kickback" payments to Shelton and also engaged with Shelton in the fifty-fifty splits. The "kickbacks" consisted of some thirty-six (36) transactions with Shelton, alleged in Counts 42 through 78 of the indictment, upon which Shelton was found guilty by the jury. Significantly, the record shows that in each instance Skipper was paid by county warrant received through the United States mail. (Id. at 252.) On the other hand, there was evidence that in many, if not most, instances of payment to vendors Joe Swank and Henry Peak (Peak), they or their representatives took possession of the county warrants in the office of the County Clerk and the mails were not used.

It is also significant, from an evidentiary standpoint, that Skipper's testimony was enhanced by the testimony of Dorothy June Griffin of Farris, Oklahoma, who, from 1963 until February, 1980, operated the Griffin Lumber Company. She testified that since the latter part of 1973, she had made "phony" invoices for a number of material suppliers in Oklahoma, in return for which she would receive five to ten percent of the gross amount of the invoice. (Id. at 379–84.) She testified about several phony invoices she had prepared at Skipper's request. On cross-examination, Mrs. Griffin testified that in either 1977 or 1978, in a motel room in Oklahoma City in the presence of her daughter-in-law, she spoke to Shelton about "kick-backs." (Id. at 403–04.) Skipper, on direct examination, had identified two "phony" invoices he received

from Mrs. Griffin. One was dated June 16, 1977, for lumber in the amount of $844.80; Fred Shelton's signature appeared on the delivery ticket. (*Id.* at 248.) Skipper testified that he split the money from this "phoney" invoice with Shelton. (*Id.* at 249.) Prior thereto, on March 18, 1977, Skipper submitted a "phony" invoice for some culvert pipe purportedly purchased from Mrs. Griffin, representing a purchase price of $528.00 and showing delivery to Shelton. Shelton's signature appears on the delivery ticket. Skipper testified that he split the proceeds from this "phony" invoice fifty-fifty with Shelton in cash. (*Id.* at 239–243.)

Henry Peak, owner of Muskogee Supply and Equipment Company, had sold road supplies to Muskogee County since 1966. Peak testified that from that date until 1981, he paid Shelton ten percent kickbacks on some one-hundred transactions, corresponding to Counts 77 through 177 of the indictment. (*Id.* at 329–35.) Peak also testified to some three or four "splits" (fifty-fifty transactions) he participated in with Shelton. Peak and Shelton were close friends. They attended high school together and entered the service together during World War II. Peak encouraged Shelton to run for county commissioner and supported him throughout his terms.

At the time of Shelton's trial, Swank, Skipper, and Peak had been indicted in the identical transactions charged to Shelton (and others). Each had entered guilty pleas under plea-bargain agreements with the United States Attorney which were not binding upon the district court in relation to sentencing proceedings.

Shelton testified that he had never received any "kick-backs" or taken any "splits." He presented four character witnesses who testified to his reputation for truth, honesty, and character in the community. Six witnesses appeared on behalf of Shelton to refute the government's evidence relative to mailings of county warrants in payment to vendors. We observe, however, that none of those witnesses refuted the evidence that all of vendor Skipper's payments were received by mail.

Five vendors testified that they had sold materials and supplies to the county through Shelton and that they had not paid Shelton any kickbacks nor had Shelton asked them to do so. Witness Sam Irving, who had worked under Shelton for seventeen years as bridge foreman for Muskogee County District 1, testified that he recalled placing certain creosote boards purchased from Skipper's S & S Supply about June 17, 1977, as a bridge floor, and placing some galvanized pipe acquired from Skipper about March 18, 1977, in a road drainage ditch. (R., Vol. II at 652–63.) These materials were the subject of the fifty-fifty splits which Skipper testified he effected with Shelton.

On appeal, Shelton contends that he was denied a fair trial and that his conviction should be reversed because: (1) the trial judge denied him a fair trial by belittling defense counsel before the jury, (2) the government denied him a fair trial by reason of prejudicial closing arguments, (3) he was denied a fair trial by deficiencies in voir dire, (4) he was prejudiced by the total of 180 counts, (5) he was denied the right to call seventy-three witnesses, (6) the jury did not test the elements of each count against the evidence, (7) the facts of the case did not meet the statutory elements of mail fraud as a matter of law, and (8) the combination of procedural and substantive deficiencies mandate a new trial.

The allegation set forth in (7) above is the only one, in our view, which can be construed as a challenge to the sufficiency of the evidence. It is tied to alleged failure by the government to present evidence meeting the statutory elements of mail fraud as a matter of law. In reviewing a challenge to the sufficiency of the evidence following conviction, we must view all of the evidence, both direct and circumstantial, and all reasonable inferences to be drawn therefrom, in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Massey*, 687 F.2d 1348 (10th Cir.1982); *United States v. Blitstein*, 626 F.2d 774, 776 (10th

Cir.1980), *cert. denied,* 449 U.S. 1102, 101 S.Ct. 898, 66 L.Ed.2d 828 (1981); *United States v. Petersen,* 611 F.2d 1313, 1317 (10th Cir.1979), *cert. denied,* 447 U.S. 905, 100 S.Ct. 2985, 64 L.Ed.2d 854 (1980); *United States v. Crocker,* 510 F.2d 1129, 1139 (10th Cir.1975). A defendant is entitled to a fair trial but not a perfect trial. *Lutwak v. United States,* 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953); *United States v. Fritz,* 580 F.2d 370, 378 (10th Cir.1978), *cert. denied,* 439 U.S. 947, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978). If substantial evidence supports the jury verdict, it cannot be set aside. *United States v. Themy,* 624 F.2d 963, 965 (10th Cir.1980). In the instant case, the jury, not this court, observed the appearance and demeanor of the witnesses, appraised their credibility, determined the weight to be given to their testimony, drew permissible inferences therefrom, resolved conflicts in the evidence and reached ultimate conclusions of fact. Those are functions exclusively reserved to the trier of fact. *United States v. Themy, supra* at 966; *United States v. Waldron,* 568 F.2d 185, 187 (10th Cir.1977), *cert. denied,* 434 U.S. 1080, 98 S.Ct. 1276, 55 L.Ed.2d 788 (1978). "It is fundamental that the appellate court does not weigh conflicting evidence or pass on the credibility of witnesses." *United States v. Posey,* 647 F.2d 1048, 1051 (10th Cir.1981). *See also United States v. Downen,* 496 F.2d 314, 319 (10th Cir.1974), *cert. denied,* 419 U.S. 897, 95 S.Ct. 177, 42 L.Ed.2d 142 (1974).

■ We must reject the challenge to the sufficiency of the evidence out of hand. *See United States v. Primrose,* 718 F.2d 1484, 1489–91 (10th Cir.1983); *United States v. Gann,* 718 F.2d 1502, 1504 (10th Cir.1983). In the record there is ample evidence, if believed by the jury, that all of the county warrants in payment of invoices mailed to the county clerk by Skipper were mailed to Skipper from the office of the County Clerk of Muskogee County. "The federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud...."

*Kann v. United States,* 323 U.S. 88, 95, 65 S.Ct. 148, 151, 89 L.Ed. 88 (1944).

## I.

■ Shelton contends that the trial judge denied him a fair trial by belittling defense counsel in the presence of the jury.

Dorothy June Griffin was called as a government witness. She had been a vendor under the business name of Griffin Lumber Company from 1963 until February, 1980, mainly engaged in selling materials and supplies to county commissioners. Early in the ongoing investigation, she had reluctantly disclosed her part in the illegal "kickback" and "split" schemes to IRS agents from the Criminal Division. (R., Vol. I at 382–83.) Among other acts, she informed the investigators of the previously referred to "phony" invoice she prepared for Skipper of supplies purportedly delivered to Shelton, and of her reference to "kickbacks" at a meeting with Shelton in Tulsa. Mrs. Griffin testified that she had cooperated with the federal government investigators since February 7, 1980. (Id. at 390.) Part of her cooperative work was to approach county commissioners and discuss their involvement in the alleged frauds, which discussions were recorded with tapes on her person, (Id. at 392), or by recorded telephone conversations, (Id. at 393). On cross-examination, counsel for Shelton handed Mrs. Griffin a document prepared by a Government agency dated March 19, 1980, which was an FBI agent's report or version of a taped conversation between Mrs. Griffin and Skipper. This report had been made available to defense counsel by the office of the United States Attorney. The statement was handed to Mrs. Griffin for her review. When defense counsel asked Mrs. Griffin whether she or Skipper had made a particular statement referred to in the report, Mrs. Griffin responded that she could not be sure unless she heard the tape because it had been a long time since she last heard it. (Id. at 396.) When defense counsel pressed Mrs. Griffin as to who made the remark set

forth in the report ("The commissioners they have done business with in the past are all out of office"), she responded that she did not know "how it's being referred to." (*Id.* at 397.)

When defense counsel offered the statement prepared by the FBI agent into evidence, an objection was lodged on the ground that it did not represent Mrs. Griffin's statement. The court sustained the objection. Defense counsel then asked Mrs. Griffin "Well, would you agree that somebody made the observation that the Commissioners that you did business with were no longer in office?" (*Id.* at 398.) Objection was made "as to what somebody else did, or what somebody else said" and it was sustained. Thereupon, defense counsel stated "Well, your Honor, it [the statement] could only be made by three people," followed by counsel's explanation that it had to be made by either Mrs. Griffin, Mr. Skipper or some agent with the FBI. Counsel then asked Mrs. Griffin who, out of these three, had made the statement. Objection again was lodged on the ground that the written document was not Mrs. Griffin's, but somebody else's, and that Mrs. Griffin had already answered the question. The following colloquy then occurred between the trial court and defense counsel:

THE COURT: You see, that's the problem. There isn't any such evidence.

MR. PEARSON (Defense Counsel): Well, Your Honor, we were furnished this by the Federal Government.

THE COURT: But, Mr. Pearson, that doesn't make any difference whether you were furnished a considerable amount of material, as I have told you before. And I know what you want to do, you want to—you were furnished a considerable amount of material, counselor, at the order of the Court, all material of various kinds, because of your request for it. And if it's proper, then it may be admitted. Just because it was submitted to you doesn't mean it is proper evidence. *Surely you know that. You do know that, don't you?*

MR. PEARSON: Your Honor, I know that—

THE COURT: Let me just ask you, do you or do you not know just because it was given to you by Government counsel that that doesn't mean that it's relevant, competent evidence; you do know that, don't you?

MR. PEARSON: Your Honor, I know that if it has to do with the issues in this cause, it sure should be relevant to prove—

THE COURT: Well, I didn't ask you to make a speech. All right, objection sustained. I was trying to explain it to you, *but I'm not going to take time out to hold law school here, Mr. Pearson.*

MR. PEARSON: Sir, I didn't understand you.

THE COURT: I'm not going to take time out during this trial to conduct a law school. You just go ahead.

MR. PEARSON: Thank you, Your Honor.

(Id. at 400–01.)

Shelton reasons that the above exchange resulted in substantial prejudice to the credibility of all subsequent statements of defense counsel, and that the judge's statements cast defense counsel in the role of an "incompetent." He relies on *United States v. Spears*, 558 F.2d 1296 (7th Cir.1977), where, he contends, a "similar" exchange between the court and defense counsel occurred and the appellate court held the trial court's castigation of defense counsel to be reversible error. The *Spears* court, while recognizing that defense counsel deserved reprimand or censure (which, the court observed, should have been made outside the presence of the jury), held that the court's comment that the jury will have "some question about believing you" deprived the defendant of a fair trial.

We hold that no reversible error occurred in the instant case. First, the trial court did not in anyway attack defense counsel's credibility. He did not imply that he could not be believed, as in *Spears*. Rather, the court was understandably upset because defense counsel, who had been provided

with a copy of the document by the United States Attorney, did not recognize that the taped conversation, not the document purporting to relate in summary fashion what was said, was the best evidence. It is, of course, the single remark by the trial court to the effect that the trial judge did not intend to take time to "hold law school here" that is the focus of defense counsel's contention. In our view, this contention is simply without merit. It is tantamount to a claim that counsel may and should be excused from comments and actions which are improper and offensive, but that any slight excess by the trial court rises to the stature of reversible error. This is nonsense.

In *Cooper v. United States*, 403 F.2d 71 (10th Cir.1968), we held that there was no merit to the contention that the trial judge's remark that defense counsel's comment on an item he had introduced into evidence was "ridiculous" constituted such prejudice as to deny the accused a fair and impartial trial. We there observed:

> While indications in the presence of the jury that statements of the defense counsel are ridiculous, are not to be encouraged, such conduct does not constitute reversible error. *Petersen v. United States*, 268 F.2d 87, 88 (10th Cir.1959). Indeed, that incident and others discussed above, were no more than displays indicative of a firm control of the proceedings and fall well within the reasonable bounds within which a trial judge may act. *Inland Freight Lines v. United States*, 191 F.2d 313 (10th Cir.1951).

*Id.* at 73.

Again, in *Lowther v. United States*, 455 F.2d 657 (10th Cir.1972), *cert. denied*, 409 U.S. 857, 93 S.Ct. 139, 34 L.Ed.2d 102 (1972), we held that the trial court's statement that it did not ask for "contemptuous conduct" by defense counsel did not deny the defendants a fair trial. We said:

> [T]he trial court acted properly in ordering counsel not to comment on what was not then in evidence. The Court has the power to direct the trial along recognized lines of procedure in a manner reasonably thought to bring about a just result. Non-prejudicial comments may be made by the Court from time to time.

*Id.* at 666.

In *Whitlock v. United States*, 429 F.2d 942 (10th Cir.1970), defense counsel was threatened by the trial court with contempt. We there observed that although defense counsel was caused some disappointment and discomfort, this did not interefere with the fairness of the trial. *Id.* at 947. The same is true of the remarks of the trial judge in the instant case. A remark indicating that defense counsel's conduct is "contemptuous" is certainly more pointed and personally critical than the "holding law school" remark complained of here. *See also United States v. Crawford*, 707 F.2d 447, 451 (10th Cir.1983); *United States v. Baker*, 638 F.2d 198, 203 (10th Cir.1980); *United States v. Gigax*, 605 F.2d 507, 510 (10th Cir.1979); *Rasmussen Drilling v. Kerr-McGee Nuclear Corp.*, 571 F.2d 1144, 1154 (10th Cir.1978), *cert. denied*, 439 U.S. 862, 99 S.Ct. 183, 58 L.Ed.2d 171 (1978); *United States v. Cardall*, 550 F.2d 604 (10th Cir.1976), *cert. denied*, 434 U.S. 841, 98 S.Ct. 137, 54 L.Ed.2d 105 (1977); *United States v. MacKay*, 491 F.2d 616, 622 (10th Cir.1973), *cert. denied*, 419 U.S. 1047, 95 S.Ct. 619, 42 L.Ed.2d 640 (1974).

Considering the context of the entire trial, and the instructions given to the jury, the trial judge's law school remark was clearly nonprejudicial in a constitutional sense. It could not have been interpreted as an indication of the trial court's belief that the defendant was guilty of the charges. The criticism directed to defense counsel was invited. The remark could not have influenced the jury in favor of the government and against Shelton.

The United States Supreme Court recently spoke on the issue of a fair trial in the case of *McDonough Power Equipment, Inc. v. Greenwood*, —— U.S. ——, ——, 104 S.Ct. 845, 848, 78 L.Ed.2d 663 (1984):

> This court has long held that " '[a litigant] is entitled to a fair trial but not a perfect one,' for there are no perfect

trials." (Citations omitted.) Trials are costly, not only for the parties, but also for the jurors performing their civic duty and for society which pays judges and support personnel who manage the trials.

We have also come a long way from the time when all trial error was presumed prejudicial and reviewing courts were considered "citadels of technicality." *Kotteakos v. United States,* 328 U.S. 750, 759 [66 S.Ct. 1239, 1245, 90 L.Ed. 1557] (1946).... The harmless error rules adopted by this Court and Congress embody the principle that courts should exercise judgment in preference to the automatic reversal for "error" and ignore errors that do not affect the essential fairness of the trial.

We hold that the trial court's remarks did not affect the essential fairness of the trial.

## II.

Shelton argues that most of the closing argument of the prosecutor was based "upon nothing less than the 'deliberate, extensive, and highly prejudicial,' comments held in *Whiteside v. Bordenkircher,* 435 F.Supp. 68 (W.D.Ky.1977) to be reversible error."

In his brief, Shelton points out the following:

In closing argument the prosecutor relates that the witnesses that the government used had good reputations before their conviction. He informs the jury that it is all a state wide scandal, and "it has been a black eye on the State of Oklahoma." IX Record 827.

He expounds upon more evidence that is also not in the record to give his version of how plea bargaining takes place. *Id.* 828–829. He makes a psycho analysis of the defendant that is based upon further facts that he introduces for the first time into evidence. IX Record 831.

Fred Shelton is not afraid of what kind of punishment he is going to get. Fred Shelton, you have seen these kind of men. Fred Shelton can't look at his wife, Fred Shelton can't look at his daughter, Fred Shelton can't look at his brothers, Fred Shelton can't look at all the people in Muskogee County that love him so dearly and tell them what he has been doing. And he's going to go down fighting because he can't do that. He would say I would rather go down fighting, let them send me on, I'm going to go down fighting, because they will never hear it from Fred Shelton that I violated that trust.

The prosecutor then builds his own hypothetical conspiracy and alleges that it is specifically what the defense has suggested. IX Record 823.

I got to thinking I might get indicted for even being in here prosecuting Mr. Fred Shelton. It's the Government—you've got to believe, if you believe their defense, you have got to believe that Roger Griffith, the FBI, Donn Baker, and the United States Attorney's office got Joe Swank, Henry Peak, Dorothy Griffin, Sharon Griffin, and Joe Skipper, and we got them up in our office and we said, "Here's the game plan. We're going after Fred Shelton. We don't like Fred Shelton and we're going to go get him."

He concludes the explanation of the conspiracy with a statement that intimates that if the defendant is to be acquitted, the judge himself would have to be found as an active participant. IX Record 830.

I'm telling you, folks, that Henry Peak, the man is doing twelve years. And you know, this conspiracy deal almost has to go as far as you're going to have to throw the Judge in on the deal, because you see, Mr. Norman said that Henry is coming in here, he thinks that if he will tell all this stuff, that on this Rule 35 motion that the Judge in some way is going to pat him on the head and say, "That's a good boy, appreciate you coming in here and telling that stuff, I'm going to turn you out."

Do you believe that? If you do, then turn him loose.

Brief of Appellant at 10–11.

■ No objection was lodged to the prosecutor's closing argument. Thus, this

court cannot reverse unless the remarks constitute "plain error" under Fed.R. Crim.P. 52(b), 18 U.S.C.A., which this court has described as "serious prejudicial error" affecting life or liberty requiring action by the appellate court even though not called to the attention of the trial court. *United States v. Guerrero*, 517 F.2d 528, 531 (10th Cir.1975); *Tapia v. Rodriquez*, 446 F.2d 410, 414 (10th Cir.1971). *See also United States v. Splain*, 545 F.2d 1131, 1136 (8th Cir.1976).

■ In all such contentions, our focus must be on the entire transcript giving rise to the challenge. This must, of necessity, be the manner by which we measure allegations of prosecutorial misconduct. On this basis, we have held certain closing remarks of prosecutors to be so prejudicial as to require a new trial. In *United States v. Rios*, 611 F.2d 1335, 1342 (10th Cir.1979), *cert. denied*, 452 U.S. 918, 101 S.Ct. 3054, 69 L.Ed.2d 422 (1981), we reversed because of the prosecutor's personal attacks on defense counsel, allegations that a defense investigator contrived testimony, expressions of personal belief in the defendant's guilt, and arguments concerning facts not in evidence. In *United States v. Latimar*, 511 F.2d 498, 503 (10th Cir.1975), we held that it was reversible error for the prosecutor to advance his personal opinion concerning the defendant's guilt and to argue facts not in evidence. And in *United States v. Ludwig*, 508 F.2d 140, 143 (10th Cir.1974), we reversed because the prosecutor persisted in personally vouching for the credibility of prosecution witnesses.

In the case at bar, defense counsel's closing argument referred to Henry Peak as a liar, implying that Peak had cooperated with the government in order to reduce the length of his sentence. (R., Vol. II at 802–03.) Defense counsel vouched for his own reputation when he contended that his mother and father "brought me up not to call somebody a liar" and thereupon referred to Joe Swank as "[a]n admitted liar, a convicted felon." (*Id.* at 804.) In regard to Skipper, defense counsel referred to him as "[a]n admitted liar, a convicted felon."

(*Id.* at 805.) Defense counsel remarked that he did not know why Peak, Swank and Skipper were cooperating with the government but "[t]hey are all three admitted felons, pled guilty or convicted, and have told hundreds of thousands of lies." (*Id.* at 806.) The only fair interpretation to be given defense counsel's remarks concerning the testimony of Peak, Swank, and Skipper was that they had appeared as witnesses against Shelton and had lied about Shelton's participation in "kickbacks" and "splits" because of pressure and duress from the government. This alleged pressure included references to a government payoff: "[A]bout the suppliers (Peak, Swank and Skipper). What do they hope to gain? Plead to one count, get seven counts reduced. I don't know what they're going to make when they are going to get out. You can't say either. But would you suppose they could make 3,000 a year? Would you suppose they could make 10,000 a year? *Well, ever what they could make, that's just a reward the Government has placed on them to testify to falsehoods.*" (*Id.* at 820.) (Emphasis supplied.) On another occasion, defense counsel inquired why the government did not give the suppliers who agreed to testify polygraph tests, implying that the government had only cooperated with known liars. Defense counsel referred to the tremendous power, wealth, and manpower of the Federal Government when it determines to prosecute a person. Counsel argued that "If the United States Government wanted to indict Jesus Christ, they could take the devil himself before a grand jury and get an indictment." (*Id.* at 821).

■ We hold that the prosecutor's comments did not constitute plain error. These remarks were in direct response to remarks of defense counsel which specifically impugned the integrity and honesty of the Federal officers and agencies to the extent of suggesting that the suppliers had knowingly lied in their testimony against Shelton in return for leniency and future monetary gain. Under these circumstances, the prosecutor's responses could not be said to de-

prive Shelton of a fair trial. *See United States v. Praetorius,* 622 F.2d 1054, 1061 (2d Cir.1979), *cert. denied,* 449 U.S. 860, 101 S.Ct. 162, 66 L.Ed.2d 76 (1980). They did not constitute the "emphatic and personalized vouching" for the integrity of witnesses as found in *United States v. Ludwig, supra* at 143 (10th Cir.1974), and they did not contain any "contrived" statement of facts condemned in *United States v. Rios, supra* at 1343–44. The government responses simply did not deprive Shelton of a fair trial. *See United States v. Brewer,* 630 F.2d 795 (10th Cir.1980); *United States v. Bishop,* 534 F.2d 214 (10th Cir.1976); *Sanchez v. Heggie,* 531 F.2d 964 (10th Cir.1976), *cert. denied,* 429 U.S. 849, 97 S.Ct. 135, 50 L.Ed.2d 122 (1976).

This case was tried and argued vigorously. The unfair innuendoes were cast into the mix by defense counsel. Under such circumstances, the failure of the prosecutor to respond could very well lead the jurors to conclude that the government had *in fact* contrived to obtain false testimony against Shelton. A prosecutor is certainly not relegated to the position where he is "confined to such detached exposition as would be appropriate in a lecture." *United States v. Bishop, supra,* at 220 (quoting *United States v. Isaacs,* 493 F.2d 1124, 1164 (7th Cir.1974), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974)).

The prosecutor's remarks were fairly anchored to the facts. They did not divert the jury from its sworn duty to decide the issue of innocence or guilt based on the evidence and the instructions of the court. The remarks could not have reasonably affected the jury verdict. *See United States v. Segal,* 649 F.2d 599, 604 (8th Cir.1981).

### III.

Shelton contends that he was denied a fair trial by deficiencies in the voir dire. There are four specific allegations of trial court abuse of discretion. We shall summarize and discuss each.

One instance of alleged prejudicial voir dire involved a juror who advised the court that she had read some stories in the Muskogee paper about the Shelton case but that it involved "[n]othing more than it was coming up and the general idea." (R., Vol. I at 45–46.) The court then asked as to whether it had affected her ability to be fair and impartial, and stated that the important thing is that one's mind had not been made up or an opinion formed. The court had previously made it clear that if any juror believed that a response was necessary to indicate a possible bias, the juror was to indicate so by raising a hand or speaking out. (*Id.* at 34–35.) Shelton contends that this inquiry was insufficient and that the court "never followed through to even inquire if the questioning venireman was prejudiced." (Brief of Appellant, p. 14). There is no merit in this contention. We have said that "simply because a prospective juror admits having read newspaper accounts relative to a criminal charge is not in itself sufficient ground for excusing a juror." *United States v. Lamb,* 575 F.2d 1310, 1315 (10th Cir.1978), *cert. denied,* 439 U.S. 854, 99 S.Ct. 165, 58 L.Ed.2d 160 (1978).

Another contention of prejudice arising from voir dire involved a juror who acknowledged a casual acquaintance with an Assistant United States Attorney. The court carefully inquired whether the relationship was such that the juror could not serve in a fair and impartial manner, to which the juror responded, "No sir." (R., Vol. I at 50.) The court did not leave the matter there; instead, the trial judge explained the matter further and obtained the same response from the juror. (*Id.*) Significantly, at this point the trial judge informed counsel that if there "[i]s any matter you wish to bring to the Court's attention concerning challenge for cause or any other relevant matters, you bring that to my attention and ask to approach the bench or I will presume that you have waived it." (*Id.* at 51.) Prior thereto, the court requested that counsel approach the bench to determine whether "[t]here are more questions they want me to ask. If you gentlemen will come up now, one lawyer for each

side." (*Id.* at 42.) Following this remark, a conference was held and both sides were given every opportunity to suggest additional questions going to cause. Neither side advanced any challenges for cause. (*Id.* at 44.) Nevertheless, on appeal Shelton criticizes the trial court for "not following through," for making only "limited inquiry" and "never directly asked [asking] if they had impartiality regardless of the source." Brief of Appellant at 14. In summary, Shelton contends that "the totality of the above factors produced certain reversible error, especially when considered in the context of the rest of the case." *Id.* at 16.

■■■■ We have carefully reviewed the record and have studied each area of contended trial court error relating to voir dire. We hold that there is no merit in Shelton's contention of error. The trial court was meticulous, cautious, and fair. The court did not abuse its discretion by dismissing one prospective juror for cause who was acquainted with Shelton, but not dismissing a juror who was acquainted with an FBI agent involved in the case. No bias has been established. The court solicited the aid and suggestions of counsel with respect to voir dire. Neither side believed or voiced concern with regard to lack of adequate voir dire at trial. The right to a fair and impartial jury applies to the government in the same manner as it does a defendant. *Hayes v. Missouri*, 120 U.S. 68, 7 S.Ct. 350, 30 L.Ed. 578 (1887).

In *McDonough Power Equipment, Inc. v. Greenwood, supra*, the Supreme Court made it clear that challenges to voir dire must rise to prejudicial error affecting a fair trial, and that counsel for the respective parties have an obligation to attempt to obtain information from jurors. In the case at bar, counsel were provided full opportunity to recommend specific voir dire questions. The trial court solicited counsel's recommendations. The record reflects a full, fair and adequate voir dire.

In *United States v. Baker*, 638 F.2d 198, 200–01 (10th Cir.1980), we observed:

The principles governing the sufficiency of *voir dire* questions derive from the Sixth Amendment guarantee of an impartial jury in criminal prosecutions. The function of *voir dire* is to lay the predicate for both the judge's and counsel's judgment about the qualifications and impartiality of potential jurors. Without an adequate foundation, counsel cannot exercise sensitive and intelligent peremptory challenges, that suitable and necessary means of ensuring that juries be in fact and in the opinion of the parties fair and impartial. *See Swain v. Alabama*, 380 U.S. 202 [85 S.Ct. 824, 13 L.Ed.2d 759] (1965); *Lewis v. United States*, 146 U.S. 370 [13 S.Ct. 136, 36 L.Ed. 1011] (1892). When the trial court undertakes the examination of potential jurors, it has a duty to consider the perspective of informed counsel, as well as its own, in determining what questions will tend to reveal possible juror prejudice.

Our review of the trial court's effort in this regard is informed by the principle that *voir dire* is within the sound discretion of the trial court and that the court's discretion will not be disturbed unless there is a clear showing of abuse.

*See also Ristaino v. Ross*, 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976); *United States v. Ainesworth*, 716 F.2d 769 (10th Cir.1983); *Lowther v. United States*, 455 F.2d 657 (10th Cir.1972), *cert. denied*, 409 U.S. 857, 93 S.Ct. 139, 34 L.Ed.2d 102 (1972).

■■■■ We hold that the trial court properly exercised its discretion in conducting voir dire. It was clearly adequate to test the qualifications and competency of the jurors. We observe that similar challenges to the trial court's conduct of voir dire were rejected by this court in *United States v. James*, 728 F.2d 465 (10th Cir. 1984); *United States v. Primrose, supra*, and *United States v. Boston*, 718 F.2d 1511 (10th Cir.1983).

### IV.

Shelton contends that he was denied a fair trial because the charge of 180 total counts was *in itself* prejudicial. One-hun-

dred seventy-eight counts charged Shelton with mail fraud pursuant to 18 U.S.C. § 1341, which defines the crime of mail fraud substantially as follows:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or by obtaining money or property by means of false or fraudulent pretenses, representations or promises ... for the purposes of executing such scheme ... places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be [punished].

As previously observed, *all* of the warrants in payment to Skipper involving the ten-percent "kickback" to Shelton were mailed from the Muskogee County Clerk's office, following approval of the vouchers for payment by Shelton. Mail fraud, we have observed, is established by proof that the defendant (Shelton) schemed to obtain money by false representations, and that the mails were used in furtherance of the scheme. *United States v. Themy, supra; United States v. Seasholtz*, 435 F.2d 4 (10th Cir.1970).

■ Shelton's main contention is that being charged with 180 counts made adequate defense "nearly impossible." Brief of Appellant at 18. This contention is followed by the complaint that when the trial court reduced from seventy-eight to five the number of suppliers Shelton wished to call as witnesses (on the apparent basis they had not been involved in any "kickback" transactions with Shelton), the reading of the 180 counts alone became prejudicial. We hold that there is no merit in these contentions. First, it is fundamental that charges may be joined in one indictment where they arise from the same or continuing act or transaction and are of the same or similar character, thus coming together to constitute parts of a common scheme. Rule 8(a), Fed.R.Crim.P., 18 U.S. C.A.; *United States v. Petersen, supra.* Although Shelton acknowledges that there is no identifiable prejudice in the *joinder* of the 180 counts, still he contends that "the total of 180 counts being decided in a short time by the jury resulted in objectively provable confusion." Brief of Appellant at 18.

■ There is nothing in this record evidencing "objectively provable confusion" on the part of the jury. There has been no prejudice demonstrated. The joinder did, on the other hand, serve the public interest in avoiding unnecessary duplication, expense and assuring a fair and speedy trial. In *United States v. Radetsky*, 535 F.2d 556 (10th Cir.1976), *cert. denied*, 429 U.S. 820, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976), the defendant was indicted on forty-one substantive counts of submitting allegedly false medicare claims. There, a bill of particulars was provided. In the case at bar, no bill of particulars was ordered, the trial court having found that each count in the indictment set forth the essential elements of the offenses charged and apprised Shelton of the nature of the crime so that he was able to prepare a defense, avoid surprise and plead former jeopardy. (R., Vol. I at 50–51). We agree. *See United States v. Herbst*, 565 F.2d 638 (10th Cir.1977); *United States v. Moore*, 556 F.2d 479 (10th Cir.1977); *United States v. Tokoph*, 514 F.2d 597 (10th Cir.1975).

### V.

■ We have considered the remaining allegations of error advanced by Shelton and hold that they are individually and collectively without merit. Shelton contends that the trial court erred in reducing the number of vendor witnesses he wished to call as defense witnesses from seventy-eight to five. Each witness would have testified that they did not give Shelton any kickbacks and that Shelton did not request any. Shelton reasons that because he was confronted with 177 counts of mail fraud, he was entitled to call the seventy-eight

vendors. However, that decision is within the discretion of the trial court. Because the five vendors did testify, the testimony of the other vendors would have been repetitious and cumulative. *See* Fed.Rules Evid., Rule 403, 28 U.S.C.A. Hence, we hold that the trial court did not abuse its discretion. Shelton contends further that the jury did not consider each count and its elements separately, and that the jury was confused by the number of counts and the evidence. This contention is entirely speculative, and, in any event, the jury verdict is supported by substantial evidence.

Shelton argues next that the evidence did not meet the statutory elements of mail fraud as a matter of law, i.e., that the alleged scheme must, under the dictates of *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974) contemplate the use of the mails as an essential element. In light of the evidence that many of the warrants were not mailed by the Muskogee County Clerk (many were delivered to vendors and/or their representatives personally at the county clerk's office), Shelton urges that the choice was that of the county clerk and not that of the actors in the scheme. We rejected this argument in *United States v. Primrose, supra,* and *United States v. Gann, supra.* We held that the county's mailing of warrants to vendors was sufficiently related to the scheme by which the county commissioner received kickbacks from vendors to sustain mail fraud convictions—the mailings of invoices and warrants ensured that the vendors received payment which, in turn, was the event triggering the payment of the "kickbacks."

Finally, Shelton argues that the combination of trial court errors effectively denied him a fair trial. We disagree. In our view, Shelton received a fair and impartial trial.

WE AFFIRM.