**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**WASHITA CONSTRUCTION COMPA-**
**NY, and Billy Ray Anthony,**
**Defendants-Appellants.**

Nos. 85–1442, 85–1461, 85–1817
and 85–1819.

United States Court of Appeals,
Tenth Circuit.

April 22, 1986.

Carl Hughes, Oklahoma City, Okl. (McKinney, Stringer & Webster, Oklahoma City, Okl., with him on briefs), for defendants-appellants.

Stephen MacIsaac, Atty., Dept. of Justice, Washington, D.C. (Douglas H. Ginsburg, Asst. Atty. Gen., W. Stephen Cannon, Deputy Asst. Atty. Gen., and John J. Powers, III, Atty., Dept. of Justice, Washington, D.C., and Laurence K. Gustafson, Atty., Dept. of Justice, Dallas, Tex., with him on brief), for plaintiff-appellee.

Before McKAY, LOGAN and MOORE, Circuit Judges.

JOHN P. MOORE, Circuit Judge.

The defendants, Billy Ray Anthony (Anthony) and Washita Construction Company (Washita), were convicted by a jury of participating in a conspiracy to rig Oklahoma highway construction contract bids in violation of the antitrust statute[1] and three counts of mail fraud.[2] Anthony, the principal stockholder and president of Washita, was sentenced to eighteen months' imprisonment for each of the four convictions, his sentences to run concurrently. He was fined $40,000 under the antitrust statute and $1,000 for each mail fraud conviction. Washita was fined $80,000 for the Sherman Act violation as well as $1,000 for each mail fraud conviction.

In this consolidated appeal, the defendants raise the following allegations of error: (1) The mail fraud convictions are invalid because the evidence against the defendants is insufficient, and the statute is not applicable to collusive bidding. (2) The trial court deprived the defendants of a trial by an impartial jury when the court instructed the venire panel that this case was not connected to the highly publicized county commissioner kickback scandals. (3) The trial court erred in conducting an *ex parte* meeting with a juror and in misstating the juror's concerns to the attorneys. (4) The trial court erred in treating the evidence as probative of one continuing conspiracy, thereby confusing the preferred order of proof in admitting coconspirator hearsay. (5) The prosecutor, during closing argument, improperly invited the jury to clean up the corrupt highway construction industry by convicting the defendants. (6) The trial court erred in instructing the jury. (7) The trial court erred in denying defendants' motion for a new trial based on newly discovered evidence.

After a careful review of the record, we conclude that the defendants' allegations of error are without merit. Therefore, we affirm the convictions.

## I. Facts

On August 21, 1984, the grand jury returned a seven-count indictment against the defendants. The first count charged the defendants with participating in a combination and conspiracy "to submit collusive, noncompetitive and rigged bids to, or to withhold bids from, the Oklahoma Department of Transportation [(ODOT)] for the award of highway construction projects." The government charged anti-competitive conduct in the letting of seven highway projects between July 1978 and October 1981.[3] The second count charged

---

1. The Sherman Act, 15 U.S.C. § 1.

2. 18 U.S.C. § 1341.

3. Project I–35 McClain County was let on July 28, 1978. Haskell Lemon Construction Co. was awarded the contract. Project I–35 Noble County was let on September 21, 1979. The contract

was won by South Prairie Construction Co. Project F–91(15) Murray County was let on October 26, 1979, but all bids were rejected as too high. Project F–91(15) was relet on April 25, 1980, as two projects; SAP–50(81) Murray County/open road, and SAP–50(82) Murray County/city. Broce Construction Co. of Okla-

the defendants with knowingly making false, fictitious, and fraudulent statements as to material facts relative to F–91(15) Murray County. The remaining counts charged the defendants with violation of the mail fraud statute in mailing collusive bids for various projects and receiving progress payments for work done on SAP–50(82), a project the defendants were awarded allegedly as a result of the illegal agreement between contractors.

The trial began on October 10, 1984, and the jury returned a verdict on October 19, 1984, after deliberating most of the day. Guilty verdicts were returned on the antitrust charge and on three mail fraud counts relating to projects SAP–69(133) and SAP–50(82). The jury acquitted the defendants of making false statements under 18 U.S.C. § 1001 and violating the mail fraud statute in bidding on projects F–91(15), MC–50(90), and MC–50(94).

The government proffered the testimony of eight immunized witnesses who admitted participating in a conspiracy to prearrange which contractor would submit the lowest bid.[4] Carl Foster, former vice president of South Prairie until October 1978, and James Baldwin, former area manager for Peter Kiewit Sons Construction Co., the parent company of South Prairie, testified to their efforts to "set up" I–35 McClain County. Ken Jacobs, Foster's successor until he left the company on July 1, 1982, testified to his participation in "working out" I–35 Noble County.[5]

Milton Beyer, former field superintendent for Broce, testified to his discussions with other contractors which allowed Broce to submit the lowest bid in SAP–69(133) Stephens County, MC–50(90) Falls Creek, and MC–50(94) Turner Falls. Ray Broce, founder, principal owner, and president of Broce, testified to his efforts to set up F–91(15) Murray County and to preserve his earlier plans when the projects were relet as SAP–50(81) and (82).[6] Everett A. "Doc" Taylor and A.A. "Bud" Vance, Broce employees, testified to their roles in estimating bids after Beyer or Broce had talked to the other contractors. James Freeman, president of Frascon, admitted submitting collusive bids for Projects SAP–50(81) and (82) Murray County and SAP–69(133) Stephens County.

The mechanics of the conspiracy remained essentially the same during its operation: After the ODOT advertised its intent to award certain highway contracts, interested contractors would request a bidding proposal, which included specifications for the job and an estimate of costs prepared by the state's engineers. It was not unusual for as many as fifteen or twenty contractors to request a bidding proposal.

The monthly bid lettings were usually scheduled on Fridays. The day before the bids were opened, the ODOT would publish a list of contractors who had requested proposals. Many of the contractors would rent rooms in the Lincoln Plaza in Oklahoma City that day. On Thursday evenings the Association of General Contractors (AGC) generally would sponsor a cocktail party, which most of the contractors and vendors attended. According to the government witnesses, many of the agree-

homa, Inc., was awarded the open road contract, and the defendants were awarded the city work. Project SAP–69(133) Stephens County was also let on April 25, 1980. Broce Construction won this contract. Projects MC–50(90) Falls Creek and MC–50(94) Turner Falls were let on June 27, 1980. The contracts were also awarded to Broce Construction.

4. In its bill of particulars, the government named the following companies as coconspirators: Broce Construction Co. of Oklahoma, Inc. (Broce), Cummins Construction Company, Inc. (Cummins), Evans & Associates Construction Co., Inc. (Evans), Frascon, Inc. (Frascon), Has-

kell Lemon Construction Co. (Haskell Lemon), McConnell Construction, Inc. (McConnell), Mobile Materials Company, Inc. (Mobile Materials), and South Prairie Construction Co. (South Prairie).

5. Peter Kiewit Sons was convicted of bidrigging in Louisiana. Foster, Baldwin, and Jacobs testified against the defendants under grants of immunity.

6. Broce was convicted of violating the Sherman Act in Kansas and served an eighteen-month sentence. He and his company's employees testified under grants of immunity.

ments to submit collusive bids were made during or after the cocktail party.

According to Foster, not every contractor who had requested a bid proposal could be considered a serious contender for a contract. Foster and Beyer testified that they knew the preferences, work load, and equipment locations of the other contractors and would determine which companies could competitively bid on each project. If a contractor was seriously interested in a job because his crews were completing another project nearby or the new project was close to his company's plant, he would approach other potential competitors to ask how interested they were in the project. According to Foster, not all projects were "set up" or "worked out," and he knew that not all contractors would be receptive to his overtures.

The colluding bidders often negotiated subcontracts or promised to stay off a future project. In this way, the corporate principals would decide who would be awarded the contract. Later that night and early the next morning, the actual bids would be completed.

Once the winning contractor finished his bid, he would tell the other contractors who had promised to submit "complimentary bids" the total their bids should exceed. Before submitting a bid, each contractor was required to submit an affidavit attesting to the fact that the bid was arrived at independently and was not the product of collusion. The bid automatically would be rejected if the signed affidavit was not included in the bid documents submitted to ODOT.

Bid openings were broadcast on a local radio station on Friday. The lowest bidder would receive the contract unless the ODOT determined that the bids were too far above the engineer's estimate.

The government's witnesses testified that the conspiracy, when implemented, usually brought the desired results.[7] Several of the witnesses testified that Anthony, as president of Washita, was an active conspirator, willing to submit complimentary bids or refrain from bidding sometimes in exchange for the promise of a substantial subcontract.

## II. Mail Fraud Convictions

Title 18 U.S.C. § 1341 provides, in pertinent part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, ... any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

Therefore, mail fraud is established by proof of (1) a scheme or artifice to defraud or obtain money or property by false pretenses, representations, or premises; and (2) the use of the United States mails for the purpose of executing the scheme. *United States v. Warren,* 747 F.2d 1339 (10th Cir.1984).

The defendants challenge their three mail fraud convictions on alternate grounds: (1) the evidence linking the defendants to the conspiracy was insufficient to sustain the convictions, and (2) the mail fraud statute was not intended to reach the allegedly illegal conduct. We address these issues in turn.

### A. Sufficiency of the Evidence

The defendants argue that the government failed to prove beyond a reasonable

---

7. Foster testified to "setting up" or "working out" I–35 McClain County only to hear that the contract was awarded to Haskell Lemon, a company Foster had not contacted because he had not considered it a serious competitor. Foster, however, contacted Haskell Lemon, congratulated him on receiving a contract that Foster thought he had already worked out, and arranged to subcontract the majority of the project from Haskell Lemon.

doubt their participation in the conspiracy to rig SAP–69(133) Stephens County and SAP–50(82) Murray County/city, and, therefore, did not establish the scheme-to-defraud element in the mail fraud counts. The defendants contend that most of the evidence was irrelevant to the defendants' conduct in bidding on these particular contracts. While we agree that much of the evidence adduced related to the other projects charged under the antitrust count, we hold that there was sufficient evidence to support the defendants' convictions for mail fraud.[8]

As an appellate court reviewing a criminal conviction, we must view the evidence in the light most favorable to the prosecution. *United States v. Shelton,* 736 F.2d 1397 (10th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 185, 83 L.Ed.2d 119 (1984). The verdicts cannot be set aside if they are supported by substantial evidence. *Id.* In reviewing the evidence, this court must examine both direct and circumstantial evidence, together with all reasonable inferences to be drawn therefrom. *Id.*

In *United States v. Metropolitan Enterprises, Inc.,* 728 F.2d 444, 450 (10th Cir. 1984), this court stated that a "conspiracy is a combination of two or more persons acting in concert to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." The prosecution must prove that the conspirators explicitly or tacitly came to a mutual understanding. *Id.* at 451.

SAP–50(81) and (82) Murray County and SAP–69(133) Stephens County were let on April 25, 1980. Anthony reserved a room at the Lincoln Plaza the night before

the lettings and attended the AGC cocktail party early in the evening. Ray Broce, Milton Beyer, Doc Taylor, and Bud Vance from Broce Construction and James Freeman from Frascon also stayed at the hotel.

Broce, Beyer, Taylor, Vance, and Freeman testified that these three projects were rigged. SAP–50(81), the open road contract in Murray County, was bid on by Broce and Frascon. Broce won the contract and eventually subcontracted about six percent of it back to the defendants. Washita, Frascon, and Broce submitted bids on SAP–50(82). The defendants were awarded the contract.

Broce and Beyer testified that the agreement on the Murray County projects merely reflected the conspirators' previous arrangement on F–91(15).[9] Broce testified that he "turned it [SAP–50(82)] over to Bill, the city part. I told Bill that we weren't interested in it, and we were interested in the dirt section." Broce stated that he agreed that his company would submit a complimentary bid on SAP–50(82), "the job that Anthony was to get." Beyer, Taylor, and Vance testified that a complimentary bid was submitted on SAP–50(82). They testified that Anthony came to their work room at the hotel later that night and gave them a unit price, which was used in Broce's bid proposal for SAP–50(81) since Washita would be subcontracting a small percentage of the work on that project. No one could remember if the same number was used in the company's complimentary bid for SAP–50(82).

Broce also testified to a conversation he had at the cocktail party with Freeman,

---

**8.** The defendants do not contend that the evidence was insufficient to support their convictions under the Sherman Act for collusive bidding.

**9.** Broce testified that he approached Anthony at the cocktail party the evening before the letting of F–91(15) and learned that the defendant was interested in some but not all of the project. Broce testified Anthony agreed to submit a complimentary bid on F–91(15) in exchange for a subcontract on the city work. Broce and Beyer remembered meeting the defendant and Gerald Philpot from Mobile Materials in Anthony's ho-

tel room the morning of the letting to discuss Broce's bid. Beyer testified that everyone was concerned because the bids were higher than ODOT estimates. Taylor and Vance testified to working with Anthony after they were told by Beyer and Broce that the job had been worked out and Washita would be doing the city work on the contract. Broce, Washita, and Mobile Materials bid on the job. Although Broce's bid was lowest, it was rejected by ODOT because it exceeded the engineer's estimate. The project was split and relet as SAP–50(81) and (82).

who volunteered to "honor" Broce's low bid in F–91(15) and withhold his bid on SAP–50(81) and (82). Freeman testified that he submitted bids on these jobs because Ray Broce had asked him to but that his bids were deliberately noncompetitive. He testified that Beyer gave him figures on the split jobs. Because he assumed that the figures represented Broce's low bids, Freeman testified that he was surprised when Washita won SAP–50(82).

Beyer testified to an "unwritten deal with the contractors that they don't bother the low bidder the second time around." The deal worked to Broce's and Washita's advantage in bidding SAP–50(81) and (82) because of the previous arrangement in F–91(15). Taylor testified that Broce submitted three bids, separate bids on SAP–50(81) and (82) and a "tied bid" on both projects, because Beyer believed that ODOT would expect a comprehensive bid since Broce had submitted the low bid in F–91(15). Beyer testified it "took a little work" to juggle the figures to be low bidder on the open road portion, noncompetitive on the city part, and also noncompetitive on the tied bid.

Beyer also testified he personally arranged that Broce would be low bidder on SAP–69(133) Stephens County. After concluding that the defendants and Frascon were "obvious bidders" because they were "nearest to the area," Beyer called Anthony "and asked him if he would let us have the job because we [sic] was already there .... He agreed to it." Beyer also contacted Freeman, who stated that he did not want the contract and agreed to allow Broce to win the contract. Beyer stated that he told the defendants and Freeman "what our bid would be and they agreed that they wouldn't ... bother us, and we submitted our bid." Beyer asked both of the contractors to submit complimentary bids. In fact, Broce, Washita, and Frascon,

submitted bids on SAP–69(133) Stephens County. Broce won the contract with the lowest bid.

Beyer's testimony was corroborated by Taylor, who testified that Beyer told him that SAP–69(133) was worked out. Freeman also stated that when Beyer came to Freeman's room with figures on SAP–50(81) and (82), Beyer asked him to submit a complimentary bid on SAP–69(133) and provided him the necessary figures on that project.

Anthony denied participating in any conspiracy to rig ODOT projects, although he admitted knowing that collusive bidding was being arranged on some projects by Broce and South Prairie. The defendants offered noncollusive reasons why their bids on some contracts were too high. Although they presented the testimony of several character witnesses, no one from the road contracting industry testified on behalf of the defendants. The defendants contend that the evidence is as consistent with legitimate solicitation of bids and coordination between general contractors and subcontractors as it is with bidrigging. Moreover, the defendants argue, the government's witnesses suffered from weak independent recollection, and there were inconsistencies in their stories.

■ Our reading of the record indicates the prosecution witnesses were not enthusiastic about testifying. Their recall was often hazy, and the prosecutor on several occasions resorted to introducing grand jury testimony as impeachment on crucial evidentiary points.[10] Each of these weaknesses was highlighted by defense counsel during cross-examination and in his closing argument.

Although these weaknesses may diminish the credibility of the witnesses, they do not establish there was insufficient evidence to support the convictions as a mat-

10. Fed.R.Evid. 801(d)(1)(A) provides that prior inconsistent statements may be accorded substantive use if "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement," provided the statement is "inconsistent with his testimony, and was given under oath subject to the penalty of perjury...." *See* 4 Weinstein & Berger, Weinstein's Evidence ¶ 801(d)(1)(A)[01] (1985). Testimony given before a grand jury is included in this condition of the rule. *Id.* at n. 9.

ter of law. It is the exclusive function of the jury to observe the prosecution and defense witnesses, appraise their credibility, determine the weight to be given their testimony, draw permissible inferences therefrom, resolve conflicts in the evidence, and reach ultimate conclusions of fact. *United States v. Shelton*, 736 F.2d 1397 (10th Cir.), *cert. denied*, — U.S. —, 105 S.Ct. 185, 83 L.Ed.2d 119 (1984). The jury was adequately instructed on evaluating contradictory statements, prior convictions, bias, and grants of immunity in assessing the credibility of witnesses. Therefore, we hold that a reasonable jury could have believed Ray Broce and Milton Beyer when they testified that they had contacted Anthony about these projects and received active support in their attempts to rig the bids.

B. Applicability of 18 U.S.C. § 1341

The defendants argue that collusive bidding accomplished through the use of the mail is not a "scheme or artifice to defraud" under § 1341. The defendants contend that the government was merely deprived of its "intangible right" to have its laws obeyed, in this case, the Federal-Aid Highway Act, 23 U.S.C. §§ 101, 112(c), (d), which requires each contractor who submits a bid to file a noncollusion affidavit. According to the defendants, although bidrigging may constitute a "distasteful business manipulation,"[11] it is not mail fraud. We do not agree.

■ A "scheme or artifice to defraud" connotes a plan or pattern of conduct which is intended to or is reasonably calculated to deceive persons of ordinary prudence and comprehension. *See United States v. Themy*, 624 F.2d 963 (10th Cir.1980); *Gusow v. United States*, 347 F.2d 755 (10th Cir.), *cert. denied*, 382 U.S. 906, 86 S.Ct. 243, 15 L.Ed.2d 159 (1965). The scheme requirement is met even if defendants joined a scheme devised by someone else, as long as the requisite intent to defraud is present. *United States v. Gamble*, 737 F.2d 853 (10th Cir.1984).

We have held that § 1341 encompasses fraudulent schemes which deprive citizens of their right to have allocations of public funds made fairly, honestly, and free of corruption. *United States v. Gann*, 718 F.2d 1502 (10th Cir.1983), *cert. denied*, — U.S. —, 105 S.Ct. 200, 83 L.Ed.2d 132 (1984) (county commissioner convicted of mail fraud in receiving illegal "kickbacks" from authorized equipment purchases); *United States v. Primrose*, 718 F.2d 1484 (10th Cir.1983), *cert. denied*, 466 U.S. 974, 104 S.Ct. 2352, 80 L.Ed.2d 825 (1984).

Moreover, several other courts have held that allegations of bidrigging on publicly funded projects may constitute a "scheme or artifice to defraud" within the purview of the mail fraud statute. *See United States v. Azzarelli Construction Co.*, 612 F.2d 292 (7th Cir.1979), *cert. denied*, 447 U.S. 920, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980); *United States v. Rodgers*, 624 F.2d 1303 (5th Cir.1980), *cert. denied*, 450 U.S. 917, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981); *United States v. Climatemp, Inc.*, 482 F.Supp. 376 (N.D.Ill.1979), *aff'd, United States v. Reliable Sheet Metal Works, Inc.*, 705 F.2d 461 (7th Cir.1983); *United States v. Brighton Building & Maintenance Company*, 435 F.Supp. 222 (N.D.Ill.1977).

In *Azzarelli*, the defendants argued that an antitrust conviction constituted the exclusive remedy for bidrigging and, therefore, their mail fraud convictions were invalid. The court disagreed. The court reasoned that the element of fraud, which is necessary to sustain a conviction under the mail fraud statute, was present in the anticompetitive conspiracy. The court held that the collusive bidding scheme "plainly manifest[ed] a species of fraud or false misrepresentation" because it was intended to defeat statutory procedures for competitive bidding which were instituted in the public's interest by the federal and state government in order to obtain for taxpayers the lowest possible costs for public works. *Azzarelli*, 612 F.2d at 298. The *Azzarelli* court noted that the conspirators were required to sign and did sign state-

---

11. *Quoting United States v. Ballard*, 680 F.2d 352, 355 (5th Cir.1982).

ments that no collusion had been practiced. *Id.*

We find the *Azzarelli* rationale persuasive and consistent with our opinions in *Gann* and *Primrose.* The indictment charged the defendants with devising and intending to devise a scheme and artifice to defraud the state of Oklahoma and the United States of "[m]oney; ... their mandated right to open and free competition in the awarding of contracts for highway construction; and their right to have their programs for the development and improvement of highways conducted honestly, fairly, and free from [g]raft, trickery, deceit, corruption, dishonesty, and fraud."

 The evidence adduced at trial indicated that the conspirators arranged to win highway contracts without submitting competitive bids. The scheme devised by the conspirators circumvented the state and federal competitive bidding procedures and allowed the contractors to virtually predetermine who would be awarded a contract. By arranging for complimentary bids to be submitted, the conspirators deceitfully created the illusion of competitive bidding and concealed their illegal collusion. Finally, to effect the deception, each of the conspirators falsely represented his bid as free of collusion.

We hold the defendants' collusive bidding practices, which deprived taxpayers of the monetary advantage of competitive bidding and deprived the state and federal governments of their rights to have highway construction projects awarded honestly, fairly, and on a competitive cost basis, constitutes a "scheme or artifice to defraud." Accordingly, we hold the indictment correctly charged the defendants with violating 18 U.S.C. § 1341.

### III. Irregularities in Jury Selection

#### A. Instruction During Voir Dire

During the early stages of voir dire, the trial court made the following statement to the array:

Now, let me explain something very important to you, and I hope that everyone will pay particular attention to this. This case must be decided on the basis of the evidence produced in this case and the law that applies to it and nothing else other than your common sense.

This case has its own set of facts as will be urged to you by the respective sides. It has nothing to do with the long-standing investigations and series of trials involved in the county commissioner cases in Oklahoma. They are completely unrelated. They have nothing to do with each other, they are different people who are alleged to have committed offenses, they are different offenses charged, and there is simply no connection between them, yet it is all of our concerns that the massive publicity that was generated by that massive investigation and series of criminal proceedings known as the county commissioner scandal ... because ... it deals with public office, public agencies and public monies, that somehow there will be some confusion ... in the minds of our jurors between those two categories of investigations; and it is very important that you understand that there is none.

I assume, if I ask you how many have heard of the county commissioner cases, virtually every hand in this courtroom would go up, of course. There is no need for me to even ask that question, but there is a great need for you to understand that they are separate and apart from this case and even its category of cases, so please accept that, it is true, and you are asked to accept that as fact.

The defendants contend the trial court, by issuing this instruction, eliminated uninhibited inquiry of the prospective jury members. The defendants argue that members of the panel could not feel comfortable revealing their preconceived ideas about the connection between these scandals after the court's speech; therefore, the trial court's subsequent inquiries could not have illicited honest responses. The defendants base this conclusion on an independent public opinion survey which revealed that eighty-six percent of a sample of people in the area from which potential

jurors in the case were to be drawn felt there was a connection between the cases. The defendants argue that they were deprived of their constitutional right to an impartial jury because they were not able to exercise intelligent peremptory challenges.[12] The defendants' arguments are without merit.

The Supreme Court has held that voir dire plays a crucial function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. *Rosales-Lopez v. United States*, 451 U.S. 182, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981). A thorough voir dire is necessary for the trial court to properly assess each prospective juror's ability to impartially follow the court's instructions and evaluate the evidence, *id.*, and for defense counsel to "exercise sensitive and intelligent peremptory challenges." *United States v. Baker*, 638 F.2d 198, 200 (10th Cir.1980). "Because the obligation to impanel an impartial jury lies in the first instance with the trial judge, and because he must rely largely on his immediate perceptions, federal judges have been accorded ample discretion in determining how best to conduct the *voir dire*." *Rosales-Lopez*, 451 U.S. at 189, 101 S.Ct. at 1634; *Baker*, 638 F.2d at 201 (court's failure to ask particular questions propounded by the defense reviewed under an abuse of discretion standard).

The judicial system has shown particular sensitivity to the problems of pretrial publicity and its effect on the selection of an impartial jury. *Baker*, 638 F.2d at 201, n. 2. *See, e.g., United States v. Liddy*, 509 F.2d 428 (D.C.Cir.1974), *cert. denied*, 420 U.S. 911, 95 S.Ct. 833, 42 L.Ed.2d 842 (1975) (G. Gordon Liddy's trial in the wake of Watergate). The defendants here, however, do not dispute the propriety of the trial court's questions dealing with prospective jurors' knowledge of the bidrigging investigation or trials of other indicted contractors. Instead, they challenge the trial court's method of dealing with another highly publicized, but unrelated, investigation and series of trials.[13]

The court in *United States v. Lewis*, 738 F.2d 916 (8th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1362, 84 L.Ed.2d 383 (1985), was presented with a similar issue. Lewis was tried and convicted of mail fraud for devising and implementing a fraudulent credit card scheme. He was also a suspect in several deaths resulting from cyanide-laced Extra Strength Tylenol capsules. Between September 30, 1982, and May 23, 1983, the date of Lewis's mail fraud trial, numerous television and radio broadcasts and approximately 135 local newspaper articles mentioned or discussed Lewis and the Tylenol investigation. In conducting voir dire the district court read to the panel a "strongly worded instruction that the publicity concerning the Extra Strength Tylenol investigation and Lewis's indictment for other charges ... had nothing to do with the case before them." *Lewis*, 738 F.2d at 922. The court then conducted individual voir dire to discover the effect of pretrial publicity. The *Lewis* court held that the defendant was not deprived of his right to an impartial jury despite the massive publicity surrounding his other suspected activities. The court found that the trial court had not abused its discretion in conducting jury selection and had carefully "confronted a most difficult situation." *Id.* at 924.

■ In response to the defendants' objection to its instruction to the panel in this case, the trial court stated that it had no reason to doubt that the veniremen had not answered sincerely and truthfully concerning any connection between the cases. The trial court's finding is entitled to a presumption of correctness as long as there is support in the record for its conclusion.

---

12. The defense did not challenge any veniremen for cause, nor did it exercise two of its peremptory challenges.

13. The county commissioner scandal resulted in more than 200 prosecutions involving "kick-back" payments to Oklahoma county commissioners by vendors and suppliers of material and equipment purchased by the counties for county road and bridge purposes. The defendants were not implicated in the investigations.

*See Patton v. Yount,* 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). The defendants ask this court to overrule this finding solely on the basis of their opinion survey, despite the record, which indicates that those veniremen who remembered the county commissioner scandal accepted the court's statement. We are more persuaded by the findings of the trial judge who confronted the venire and observed its reactions than we are by statistical conclusions based upon a survey of faceless citizens. The court's conclusions are fully supported by the record, and we therefore decline the invitation to indulge in speculation.

■ Moreover, we hold that, under the circumstances of this case, the trial court did not err in prefacing its *en masse* questions with an instruction that the bid-rigging and kickback scandals were unrelated. To the contrary, we commend the court's efforts to select an unbiased jury. Finally, we hold that it was not an abuse of discretion for the court to deny the defendants' request to conduct individual voir dire on this issue. *United States v. Hall,* 536 F.2d 313 (10th Cir.), *cert. denied,* 429 U.S. 919, 97 S.Ct. 313, 50 L.Ed.2d 285 (1976); Fed.R.Crim.P. 24(a).

### B. *Ex Parte* Communications With Juror

■ The morning after voir dire was completed but before any testimony was heard, a juror approached the jury clerk and reported that she might be disqualified. In a recorded *ex parte* meeting with the court, the juror stated that her husband was appearing before another tribunal with an attorney who was a personal friend of Anthony's. The juror stated that her husband and Anthony's friend would be testifying together as expert witnesses before the Corporation Commission for the duration of the defendant's trial. The juror stated that the news media had reported earlier commission hearings, and her husband suspected that the media would also cover the hearings with which he and Anthony's friend were involved.

Judge Thompson voiced his concern over "appearances," called the attorneys in to his chambers, where he indicated the juror's recently discovered problem, and stated that he wanted to excuse the juror. The judge asked the attorneys if they wanted to question the juror on the stand. Defense counsel objected to her being excused, but declined to question her because Judge Thompson said the juror told him that she felt "compromised." Defense counsel continued to object to her dismissal.

The defendants contend that the district court, in communicating with the juror *ex parte,* violated their constitutional rights to be present at every stage of their trial. In a later review of the record, the defense discovered that the juror never said she felt compromised. The defendants claim they were prejudiced by this misstatement because they would have inquired further of the juror if the trial court had not misled them.

In *Rushen v. Spain,* 464 U.S. 114, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983), the Supreme Court stated that, while the right to personal presence at all critical stages of the trial and the right to counsel are fundamental rights of each criminal defendant, these rights are subject to the harmless error analysis. The Court reversed a Ninth Circuit opinion which held that an unrecorded *ex parte* communication between trial judge and juror can never be harmless error. The Court admonished the district court for not having contacted counsel for both parties after the juror approached him; however, the Court stated, an automatic reversal rule would undermine the administration of the criminal justice system since the "day-to-day realities of courtroom life" include occasional, and innocuous communication between the court and jurors. *Id.* at 119, 104 S.Ct. at 456.

In *United States v. de Hernandez,* 745 F.2d 1305 (10th Cir.1984), we held that whether the harmless error exception applies to *ex parte* communications is a question to be determined case by case as to whether a defendant's substantial rights

have been adversely affected. The burden is on the prosecution to show the *ex parte* communication with the jury did not prejudice the defendant. *Id.*

 Although it would have been better to have had the confrontation in the presence of counsel for both sides, we hold the district court's communication with the juror did not constitute reversible error. We can find no reason why or how the court's action prejudiced defendants. Unlike the jurors in *Rushen* or *de Hernandez,* this person did not sit on the jury. Therefore she could not have been adversely influenced by any comments by the court and, more importantly, could not have contaminated jury deliberations, or in any way prejudiced the outcome of the trial. Although the defendants have not challenged the district court's ruling dismissing the juror for cause, we hold that the court's concern with "appearances," which we interpret as the appearance of impartiality, was not an abuse of discretion in light of the public attention focused on this case.

### IV. Coconspirator Hearsay

The defendants contend there is no such thing as a "plug-in" conspiracy with different participants coming together to agree to rig a particular job. They argue that the government's case against them consisted of evidence probative of several conspiracies; therefore, the court prejudiced the defendants by not adhering to the preferred order of proof before hearsay evidence relative to each conspiracy was introduced. Their argument is without merit.

 As a preliminary matter, the defendants have not properly preserved for review the issue of whether the evidence ultimately established a single conspiracy rather than multiple conspiracies. The indictment charged the defendants with engaging in "a combination and conspiracy" to "submit collusive, noncompetitive, and rigged bids to, or to withhold bids from" the ODOT for the "award of highway construction projects." The defendants failed to object to a jury instruction based on this indictment which stated that there was

only one conspiracy. Therefore, we must interpret the defendants' argument as only raising a procedural irregularity in the admission of evidence.

 Under Fed.R.Evid. 801(d)(2)(E), an out-of-court statement is not hearsay if it "is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." In *United States v. Metropolitan Enterprises, Inc.,* 728 F.2d 444 (10th Cir.1984), we reiterated the "preferred order of proof" in trials where the admissibility of coconspirator hearsay is an issue. Initially, it is the trial court's duty to make a threshold determination as to admissibility based upon "substantial evidence" independent of the coconspirator statements. To facilitate this inquiry without exposing the jury to evidence which may eventually be ruled inadmissible, "[i]t is preferable whenever possible to require the government to first introduce independent proof of the conspiracy and subsequent thereto, to establish the connection of the defendant with the conspiracy before admitting hearsay declarations of coconspirators." *Id.* at 448. Finally, at the conclusion of all the evidence, the court must determine as a factual matter whether the prosecution has shown by a preponderance of the evidence independent of the statement itself that (1) there was a conspiracy; (2) the declarant and the defendant were members of the conspiracy; and (3) the statements were made during the course of and in furtherance of the conspiracy. *Id.* at 448–49.

Our reading of the record reveals that the trial court adhered to the preferred order of proof. Foster, the first unindicted coconspirator to testify, described his activities on behalf of his employer, South Prairie, in setting up the I–35 McClain County project. Foster described in general terms how the bidrigging conspiracy operated. He implicated several other contractors, including Cummins, Broce, Mobile Materials, Haskell Lemon, and Washita. He testified that he initially contacted Anthony at the

Thursday evening cocktail party about submitting a complimentary bid and later gave him a price that Washita should not beat. Washita's bid was above that number. Jacobs and Baldwin corroborated Foster's background testimony and implicated Evans, Cummins, and Broce in South Prairie's rigging of I-35 Noble County.

The government next attempted to adduce coconspirator statements relative to F-91(15) Murray County from Beyer. Before allowing Beyer to testify to comments made to him by Ray Broce about his conversations with Anthony, the court required "some other proof to establish membership ... [in] the conspiracy" by Anthony and Washita. The government elicited testimony that Beyer personally approached Anthony about SAP-69(133) Stephens County and received the defendant's assurance that Broce could have the project. Washita's bid on SAP-69(133) was higher than Broce's.

■ Finally, at the conclusion of the evidence, the court stated that the "evidence was ... abundantly clear and the standards and tests were ... clearly satisfied" as to the admissibility of the coconspirator hearsay. There was no error in the admission of the coconspirator statements.[14]

## V. Prosecutorial Misconduct

Defendants assert they are entitled to a reversal of their convictions because of improper comments made by the prosecuting attorney in closing argument. In response to defense counsel's comment that the government attorneys were prosecuting the industry rather than these defendants, the prosecutor stated:

Guilt by association. Ladies and gentlemen, this is conspiracy. We're not charging the defendant with guilt by association. You're not guilty because you associate with conspirators. You're guilty because you participate with conspirators; and that is what we are charging the defendant Bill Anthony with, participating with these conspirators.

*Ladies and gentlemen, I think it's abundantly clear that the highway construction industry in this state is extremely corrupt, and it's a corruption that continues and continues and continues. It is self-perpetuating. I explained to you how it is so perpetuating. It has got to be stopped. And ladies and gentlemen, you have got to make the decision on that. It's going to be a tough decision for you, but it is your decision and it is your duty to make it.*

*This type of conspiratorial action has got to come to an end, in a very real sense. As Harry Truman once said, the buck stops here.*

MR. McKINNEY: Your Honor, we object to that as being an improper statement that what the jury does with this defendant has broader implications to it.

THE COURT: Overruled. Proceed.

MR. GUSTAFSON: Now, ladies and gentlemen, we're not saying that you should convict the defendant because the highway construction industry is corrupt. We're saying that you should convict the defendant because he participated in that corruption.

The defendants argue that the emphasized portions of the prosecutor's argument constitute reversible error. We do not agree.

■ In reviewing a prosecutor's statements for reversible error, our primary concern is whether the defendant has been deprived of a fair trial. *United States v. Dickey*, 736 F.2d 571 (10th Cir.1984), *cert. denied*, — U.S. —, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985). Our review of the challenged comment must be made in the context of the entire record before the jury. *Id.* Although we have stated that a convic-

**14.** Although it is inconsequential here, we take this opportunity to suggest to trial courts in this circuit that in cases in which the evidence of conspiracy is complex, the essential facts to support hearsay be determined in a pretrial hearing. Naturally, such a proceeding is not required in every case, but when the testimony of many witnesses is required to establish the threshold, the benefits of a proceeding under Fed.R.Evid. 1101(d)(1) cannot be gainsaid.

tion should be overturned if the prosecutor's comments were "enough to influence the jury to render a conviction on grounds beyond the admissible evidence presented," we have also recognized that considerable latitude is given the prosecutor in replying to an argument raised by defense counsel's closing statement. *Dickey,* 736 F.2d at 596.

■ We hold that the comments by the prosecutor did not constitute prosecutorial misconduct requiring a new trial. The government's theory of the case was an industry-wide conspiracy, in which the defendants were participants. The evidence of the conspiracy and of Anthony's involvement was provided by other admitted bi-driggers, who were themselves members of the road contracting industry. The statements were a fair response to the defendants' arguments and were adequately supported by the evidence. The district court did not err in overruling defendants' objection.

### VI. Erroneous Jury Instruction

■ The trial court instructed the jury that:

> Certain types of conduct are regarded as unreasonable per se. This means that the mere doing of the act itself constitutes an unreasonable restraint in *interstate* commerce and it is not necessary to consider why the acts were committed or their effect on the industry or any other explanatory matter.... Conduct regarded as unreasonable per se includes price fixing and bid rigging.

(Emphasis added.)

The defendants argue the term "interstate" should have been removed from this instruction. The defendants contend the instruction unconstitutionally relieved the government of its burden of proving every element of the Sherman Act violation and thus constitutes fundamental error.

The defendants rely on *United States v. Ben M. Hogan Co., Inc.,* 769 F.2d 1293 (8th Cir.1985), *appeal pending,* which reversed a conviction based on a similar instruction.

The court reasoned that the instruction could be understood by the jury to include an unconstitutional presumption of an effect on interstate commerce. The court stated that a separate charge which instructed the jury that it must find the interstate commerce element was met did not cure the infirmity in the presumption.

The defendants in this case not only did not object to the language of the instruction given, but also submitted an instruction which is virtually identical to the one they are now challenging. Therefore, if we are to countenance this issue, we must analyze the court's instruction under the plain error doctrine pursuant to Fed.R.Crim.P. 52(b). "The Rule authorizes the Courts of Appeals to correct only 'particularly egregious errors,' those errors that 'seriously affect the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Young,* —— U.S. ——, 105 S.Ct. 1038, 1046–47, 84 L.Ed.2d 1 (1985) (citations omitted). The defendants' allegations of plain error must be viewed against the context of the entire record. *Id.* 105 S.Ct. at 1047.

In light of these principles, we hold that the challenged instruction does not constitute plain error. The interstate commerce element of the Sherman Act charge was not a seriously contested issue in the case. *Cf. Francis v. Franklin,* —— U.S. ——, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985); *Rose v. Clark,* 611 F.Supp. 294 (M.D.Tenn.1983), *aff'd,* 762 F.2d 1006 (6th Cir.1985), *cert. granted,* —— U.S. ——, 106 S.Ct. 59, 88 L.Ed.2d 48 (1985). The defendants did not object to the admission of documents relating to the interstate business conducted by Washita and waived cross-examination of witnesses whose testimonies provided ample evidence supporting the interstate element of the crime. Under these circumstances, this latent error in the instruction was harmless, and certainly it does not rise to the level of egregious error which threatens to undermine the fundamental fairness of the trial.

## VII. Motion for a New Trial

■ On March 20, 1985, the defendants moved for a new trial based on newly discovered evidence which the defendants argue was withheld from the defense contrary to the rule in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The newly discovered evidence consists of a 1983 agreement between Peter Kiewit Sons and the Department of the Army which allowed Kiewit and its subsidiaries to contract with the Army if it refrained from hiring any of its former employees who had been involved with bidrigging as consultants or independent contractors. A conviction for bidrigging would generally bar a company from bidding on Army projects.

The agreement was not produced in response to the defendants' request for exculpatory material.[15] The defendants argue that the agreement, if available for impeachment purposes, would have destroyed the credibility of the former employees of South Prairie, a subsidiary of Peter Kiewit. The defendants contend that Jacobs was violating this agreement by continuing to subcontract work from South Prairie and, thus, was strongly motivated to testify on behalf of the government.[16]

The district court found that the defendants had failed to demonstrate the materiality of the agreement and denied the motion. The court stated that the tenuous connection between Jacobs and the agreement probably could not have been proven without leading the trial into collateral, confusing issues, and the Broce employees, who were unaffected by the agreement, provided the most incriminating evidence against the defendants.[17]

The defendants argue that *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), mandates a new trial. We do not agree. In *Giglio*, the Supreme Court reiterated the *Brady* test for production of exculpatory evidence. "We do not ... automatically require a new trial whenever a 'combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict....' A finding of materiality of the evidence is required under *Brady*." *Giglio*, 405 U.S. at 154, 92 S.Ct. at 766 (citations omitted).

In *United States v. Bagley*, —— U.S. ——, 105 S.Ct. 3375, 3384, 87 L.Ed.2d 481 (1985), the Supreme Court stated that evidence is material, and therefore within *Brady*, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *See also United States v. Conner*, 752 F.2d 504 (10th Cir.1985).

In reviewing the trial court's judgment denying the defendants' motion for a new trial in light of these definitions of "materiality," we are convinced the court was cor-

---

**15.** The government argues that the prosecutors had no knowledge of the agreement and the request was not specific enough to reach this agreement. We decline to address these issues and resolve the defendants' allegations on other grounds.

**16.** At the time of his testimony, Jacobs was employed as an equipment operator for Cimarron Construction Company. Jacobs' wife owned a one-third interest in Cimarron. The defendants characterize this arrangement as a "straw man" corporation which allowed Jacobs and South Prairie to circumvent the Army agreement.

**17.** The district court found:

In order for the defendants to use the Kiewit/Army agreement to show the bias of Mr. Jacobs, the defendants would need to establish that Mrs. Jacobs' ownership in the construction business was a sham; that the subcontracts between Kiewit affiliated companies and Mrs. Jacobs' construction company were a violation of the Kiewit/Army agreement; that the Army was aware that its agreement with Kiewit was being violated; that the Army refused to debar Kiewit for a violation of the agreement; and that a substantial portion of the company's income was derived from subcontracts with Kiewit affiliated companies.

The agreement has also been held inadmissible as irrelevant and collateral in *United States v. Cherokee Paving Co.*, No. CR-84-148-R (W.D. Okla. December 19, 1984).

rect. Jacobs testified that he never discussed rigging highway contracts with Anthony. Jacobs' testimony merely corroborated the background evidence provided by Foster. The most damaging evidence against the defendants was introduced through Broce and Beyer, whose credibility could not be impeached with this agreement. Introduction of the agreement on cross-examination of Jacobs or any of the former South Prairie employees would not have affected the outcome of the trial, but would have confused the jury with collateral issues.

Accordingly, the convictions returned against the defendants are affirmed.