**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Delbert TAYLOR, Defendant–Appellant.**

No. 86–2836.

United States Court of Appeals,
Tenth Circuit.

Nov. 4, 1987.

John Walsh, Salt Lake City, Utah, for defendant-appellant.

Tena Campbell, Asst. U.S. Atty., Salt Lake City, Utah (Brent D. Ward, U.S. Atty., Salt Lake City, Utah, was also on the brief), for plaintiff-appellee.

Before HOLLOWAY, Chief Judge, BARRETT, Circuit Judge, and CONWAY, District Judge [*].

HOLLOWAY, Chief Judge.

The defendant was convicted on three counts of mail fraud and three counts of interstate transportation of moneys obtained by fraud in violation of 18 U.S.C. sections 1341 and 2314 (1982). On appeal, he argues (1) that there was insufficient evidence to support the jury's verdict; and (2) that he was deprived of effective assistance of counsel in violation of the Sixth Amendment. We affirm.

## I. FACTS

Viewing the evidence in the light most favorable to the government, as we must at this point, it tends to show these facts:

In December 1983 the defendant, Delbert Taylor ("Taylor"), was approached by Connie Lynn Dyson ("Dyson") about providing financing for a multi-level marketing program to distribute vitamins. Dyson, a marketing consultant with a background in health and nutrition, had developed the marketing program in 1981, but had been unable to locate sufficient financial backing to implement it. A friend suggested that she talk to Taylor.

---

[*] The Honorable John E. Conway, United States District Judge of the District of New Mexico, sitting by designation.

Between December 1983 and March 1984, Dyson met with Taylor, as well as several of his associates, on numerous occasions. At these meetings, Taylor portrayed himself as an expert at acquiring financing for investment concepts. He told Dyson "that he had raised a lot of money before and that he had a group of investors that would invest in ideas that he came up with." III R. 95. Moreover, he claimed to have a special expertise in selling "products that could be sold on television with 800 numbers where you can call in and buy products over the television." III R. 95–96. In particular, Taylor spoke glowingly about the success of a product he was marketing at that time known as "Beauty Lash." III R. 97.

Although Taylor was receptive to Dyson's proposal, he indicated that he and his associates might be interested in acquiring the proposed company outright rather than merely providing the financing for it. As a consequence, the agreement that Dyson and Taylor eventually reached provided that Taylor and his associates would own and manage the fledgling company, christened Gold 'N Health, while Dyson would work for the company as a full-time salaried employee. Under the agreement, Dyson was to be compensated at a salary of $2500 a month plus an automobile.

After beginning her employment, Dyson's first priority was to prepare a marketing budget for Gold 'N Health. When she submitted an initial budget of $80,000 however, the reaction of Taylor and his associates was very critical. In a meeting with Craig Alder ("Alder"), the secretary-treasurer of Gold 'N Health, Dyson's budget was rejected as too expensive. Instead, Alder suggested that the marketing budget be limited to $10,000. In response, Dyson proposed an alternative method of financing the marketing:

> So then I said: What if I can think of a way where we could raise money for marketing, would you be open to that, and they said yes, they were, and so I explained this brilliant idea that I had, that we could have what a multi-level company has, what we call a first row of distributors, which are right directly un-

der the company, and it's a very favorable position to be in when you're in a new company because all distribution is built beneath you. So I said: What if we had 20 people on that first row, and we charged them $5,000 to be in that desirable position and they thought that was a good idea. . . .

III R. 104.

Although Taylor and his associates were supportive of Dyson's proposal, an attorney expressed concern that Dyson's plan—which appeared to sell an interest in the new company—could be construed as a sale of securities and thus involve the SEC. To avoid this complication, the attorney suggested an alternative option. Under it, each investor would advance $5,000 to Gold 'N Health and receive a promissory note from Gold 'N Health signed by Taylor and guaranteed by Rainbow Mortgage Corporation ("Rainbow"), a corporation owned by Taylor. It would provide that if the notes were not redeemed within nine months of the purchase date, Rainbow would repurchase the notes for the face amount plus twelve percent interest per annum, accrued monthly.

Because Rainbow was to act as guarantor of the promissory notes, Taylor supplied Dyson with a financial statement for Rainbow. According to the financial statement, Rainbow had assets exceeding $4.8 million in value, including real estate worth $3,967,583; inventory in a product called "Beauty Lash" valued at $500,000; inventory in a product known as "Sober–Up", worth $40,000; and claims to "trace minerals" in southern Utah, valued at $200,000.

Rainbow's balance sheet contained several material misstatements. The real estate valued at $3.9 million was not in fact owned by either Taylor or Rainbow, but instead belonged to a Utah rancher named O.B. Oberhansly. In addition, the values placed on both Beauty Lash and Sober–Up were grossly exaggerated. The valuation of the Beauty Lash inventory was based on prospective future sales, rather than on its inventory value, even though only 200–300 units out of the 10,000 units that had been

purportedly manufactured were ever sold. Similarly, Sober–Up was virtually worthless. The Food and Drug Administration had ordered Taylor not to market Sober–Up as a sobriety aid. Finally, although Taylor asserted at trial that he held claims on trace minerals in southern Utah, he was unable to produce any evidence of ownership.

Using Taylor's false representations, Dyson began a campaign to acquire investors for Gold 'N Health. During her presentations, Dyson told potential investors that the money to be raised—a total of $100,000—"was strictly for marketing...." III R. 107–109. She provided prospective investors with a copy of Rainbow's balance sheet and informed them, based on Taylor's representations to her, that Taylor himself would provide $50,000 seed money to get the Gold 'N Health project off the ground. Finally, she told potential investors that $50,000 was adequate seed money because: (1) Taylor had arranged 90 day credit terms with the manufacturer of the vitamins, a tremendously favorable arrangement; and (2) Taylor had negotiated tradeouts in exchange for computer access to handle the mechanics of the business. As a consequence, the start-up costs of the company would be considerably lower than normal.

In addition to Dyson's efforts to secure investors in Gold 'N Health, Taylor participated to a limited extent in the sales effort. In a few instances, he individually met with potential investors. Further, he participated in a meeting with a group of potential investors in March 1984. At that meeting, a discussion ensued "regarding where things were at; how things were going; how much had been raised; the fact the money that was put in by the investors ... was to be used only for marketing the product. It was not to be used for purchasing product, paying expenses for the office, anything like that." II R. 95, 140.

By the end of April 1984 Dyson had located nineteen investors[1], including her son and her fiance, who purchased promissory notes from Gold 'N Health. Soon after, Dyson went on a marketing trip.

During Dyson's absence, Gold 'N Health's banking account—which contained the investment money raised by Dyson—was dissipated by Taylor. A substantial amount of money was withdrawn from Gold 'N Health's account and deposited into Rainbow's account. Moreover, Taylor used Gold 'N Health funds to pay personal obligations, including his car payment. In addition, debts of Beauty Lash were paid from Gold 'N Health's account. By June 11, 1984, the funds invested in Gold 'N Health were completely depleted and the Gold 'N Health account showed a negative balance.

Despite the dire straits of Gold 'N Health, on June 11, 1984, Taylor mailed a letter to the investors which sought to dispel their concerns. In the letter, Taylor acknowledged that Gold 'N Health had incurred problems. At the same time, however, he stated that he was implementing measures—including establishing a special account to pay off the promissory notes—that would correct any problems. In addition, Taylor offered to repurchase the promissory notes from dissatisfied investors and promised to "fulfill all agreements made to the twenty [investors]...." IV R. 100. The representations contained in the letter were false and Gold 'N Health completely collapsed soon after.

On May 21, 1986, Taylor was indicted on three counts of mail fraud, and three counts of interstate transportation of moneys obtained by fraud. At trial, Taylor denied that he had "an intent and a scheme to defraud" the investors. IV R. 126. Instead, he said that Gold 'N Health's failure was the result of incompetence rather than due to any intentional scheme. The financial misrepresentations, he insisted, arose either from misunderstandings by investors, or from unauthorized statements by Dyson. Furthermore, he contested Dyson's claim that the funds were to be used solely for marketing, arguing that they were intended to provide an infusion of capital into the umbrella corporation of

---

1. Taylor located one investor.

Rainbow, rather than to be used solely for Gold 'N Health.

The jury found Taylor guilty on all six counts, and following the judgment of conviction and sentence, Taylor appealed.

## II. SUFFICIENCY OF THE EVIDENCE [2]

In pertinent part, 18 U.S.C. section 1341 provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempting to do so ... knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any [matter or thing whatever to be sent or delivered by the Postal Service] shall be fined not more than $1,000 or imprisoned not more than five years, or both.

18 U.S.C. section 1341 (1982). The elements of mail fraud, therefore, are (1) a scheme to defraud and (2) the mailing of a letter, etc. for the purpose of executing the scheme. *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954); *United States v. Washita Constr. Co.*, 789 F.2d 809, 814 (10th Cir.1986). In assessing whether the evidence is sufficient to support the convictions, we must consider both the direct and circumstantial evidence, including reasonable inferences that can be drawn, in the light most favorable to the prosecution. *Washita*, 789 F.2d at 815; *United States v. Shelton*, 736 F.2d

1397, 1401 (10th Cir.), *cert. denied*, 469 U.S. 857, 105 S.Ct. 185, 83 L.Ed.2d 119 (1984). As long as substantial evidence supports the jury verdict, it cannot be set aside. *Shelton*, 736 F.2d at 1402; *United States v. Themy*, 624 F.2d 963, 964 (10th Cir.1980).

Taylor raises no challenge to the jury's finding that he used the United States mails. Rather, he argues that there is insufficient evidence for a jury to find that he devised a scheme or artifice with the intent to defraud the investors. Specifically, Taylor contends that because "no one named in the indictment dealt at all with Taylor until after each had invested," Appellant's Brief at 5, "there is no evidence of any knowledge on the part of ... Taylor that there was any fraud at all." *Id.* We disagree.

A scheme or artifice to defraud "connotes a plan or pattern of conduct which is intended to or is reasonably calculated to deceive persons of ordinary prudence and comprehension." *Washita*, 789 F.2d at 817; *United States v. Van Dyke*, 605 F.2d 220, 225 (6th Cir.), *cert. denied*, 444 U.S. 994, 100 S.Ct. 529, 62 L.Ed.2d 425 (1979). In many instances, however, fraudulent intent is not succeptible of proof by direct evidence. *Gusow v. United States*, 347 F.2d 755, 756 (10th Cir.), *cert. denied*, 382 U.S. 906, 86 S.Ct. 243, 15 L.Ed.2d 159 (1965). Consequently, it must often be inferred "from a series of seemingly isolated acts and instances which ... may in their totality properly justify an inference of a fraudulent intent...." *Aiken v. United States*, 108 F.2d 182, 183 (4th Cir.1939); *United States v. Krohn*, 573 F.2d 1382,

---

**2.** Taylor was convicted on three counts of mail fraud, 18 U.S.C. section 1341 (1982), and three counts of interstate transportation of money obtained by fraud, 18 U.S.C. section 2314 (1982). Section 2314 provides in part:

Whoever transports in interstate ... commerce any ... money of the value of $5,000 or more, knowing the same to have been ... taken by fraud ... shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

The elements of this offense are (1) knowledge that the money has been obtained by fraud; and (2) transporting or causing it to be

transported in interstate commerce. *Pereria v. United States*, 347 U.S. 1, 9, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1954).

Here, there is no dispute over whether money in excess of $5,000 was transported in interstate commerce. *See United States v. Newson*, 531 F.2d 979, 981 (10th Cir.1976). The only issue is whether Taylor was aware of the existence of a fraudulent scheme to obtain the money. Because this issue mirrors Taylor's challenge to his conviction under section 1341, our analysis of the issue under section 1341 disposes of Taylor's objection to his conviction under 2314 as well.

1386–87 (10th Cir.), *cert. denied sub nom. Hahn v. United States*, 436 U.S. 949, 98 S.Ct. 2857, 56 L.Ed.2d 792 (1978); *United States v. AMREP Corp.*, 560 F.2d 539, 546 (2d Cir.1977), *cert. denied*, 434 U.S. 1015, 98 S.Ct. 731, 54 L.Ed.2d 759 (1978). "[I]n determining whether a particular defendant was a member of such plan or scheme, if any, the jury should consider only his actions and statements...." *Krohn*, 573 F.2d at 1387. However, "the nature of a scheme to defraud by false representations may be shown by accumulated evidence of actions of agents and subsequent conduct and correspondence of the company involved demonstrating a course of business, an important feature of which is systematic misrepresentation by agents." *Id. See also United States v. Ranney*, 719 F.2d 1183, 1187 n. 7 (1st Cir.1983) ("It is clear that, despite his innocence, a salesman's representations may still form part of his employer's scheme to defraud...."); *United States v. Toney*, 605 F.2d 200, 207 (5th Cir.1979), *cert. denied*, 444 U.S. 1090, 100 S.Ct. 1055, 62 L.Ed.2d 779 (1980) (statements by salesmen were admissible to prove the existence of a "scheme to hype the product in a certain prescribed manner"); *AMREP Corp.*, 560 F.2d at 545 ("[S]tatements and representations made by the sales representatives in furtherance of the scheme are admissible against the officer ... even though the salesmen themselves are not participants in the fraudulent scheme.").

■ Where intent is shown by acts or representations made by agents of the defendant, rather than the defendant himself, however, "the prosecution must show that the [defendant] 'expressly or impliedly authorized or ratified' the representations." *United States v. Gibson*, 690 F.2d 697, 701 (9th Cir.1982), *cert. denied*, 460 U.S. 1046, 103 S.Ct. 1446, 75 L.Ed.2d 801 (1983) *quoting Krohn*, 573 F.2d at 1386. An authorization by a defendant "of such statements by a salesman may be found in the circumstances of the particular case, in the scope of the plan or scheme, or from other pertinent facts." *Krohn*, 573 F.2d at 1386.

■ Viewing the evidence in the light most favorable to the government, we find sufficient evidence that Taylor expressly or impliedly authorized or ratified a "pattern of conduct ... intended to ... deceive" the investors in Gold 'N Health. *Washita*, 789 F.2d at 817. The success of the plan to raise money for the marketing of Gold 'N Health hinged on the investor's perceptions that the promissory notes were safe, yet lucrative, investments. The lynch pin therefore, was Rainbow's guarantee of the notes. Without Rainbow's guarantee, any investment in Gold 'N Health would have been speculative. When supported by Rainbow, however—purportedly with assets exceeding $4.7 million—the investment appeared to be relatively safe. At the worst, an investor would receive the return of his initial investment plus twelve percent interest; at best, the return on investment could be large. Thus, Taylor's actions in knowingly presenting a false financial statement for Rainbow to Dyson could reasonably be seen as intending to deceive Dyson, and through her, the investors.

Similarly, Taylor made numerous other false statements to Dyson that were designed to enhance the attractiveness of Gold 'N Health. Consequently, Taylor's argument that he did not have actual knowledge that Dyson was using such misrepresentations to attract investors is unpersuasive and his efforts to profess ignorance are unavailing. A jury could have reasonably found that Dyson's statements that the money raised was to be used solely for marketing Gold 'N Health was a fraudulent misrepresentation calculated to deceive the investors. "Where a scheme to defraud includes marketing sales by means of certain false representations conveyed through salesmen, proof of the same representations being made at widely different places to different persons ... tends to prove that the scheme existed...." *Krohn*, 573 F.2d at 1388. Substantial evidence was presented that Taylor was personally "cognizant of the type of representations being made and both permitted and encouraged them." *AMREP*, 560 F.2d at 545. At the March 1984 meeting, for instance, it was discussed at some length

that the "money ... put in by the investors ... was to be used only for marketing the product." II R. 95.

In addition, Taylor's use of the funds raised for the marketing of Gold 'N Health for personal expenses and his other business ventures is probative of the existence of a fraudulent scheme. *See Krohn,* 573 F.2d at 1388–89. And finally, letters sent by Taylor on June 11, attempting to allay concerns about the financial stability of the company, support an inference of the intent to deceive. "A mailing is in furtherance of a scheme to defraud if it is designed to lull an investor into a sense of security after he has already paid for his investment." *United States v. Shelton* 669 F.2d 446, 458 (7th Cir.), *cert. denied sub nom. Bledsoe v. United States,* 456 U.S. 934, 102 S.Ct. 1989, 72 L.Ed.2d 454 (1982).

In sum, there was substantial evidence from which the jury could find beyond a reasonable doubt a pattern of actions and misrepresentations by Taylor and his agent, the purpose of which was to deceive potential investors in Gold 'N Health. Thus, the convictions are supported by sufficient evidence.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

Taylor's second argument is that he was denied effective assistance of counsel by his retained attorney. He says there were several unexplored avenues of defense and a variety of alleged evidentiary errors by counsel which would have resulted in a different verdict. We disagree.

■ The right to counsel is the right to effective assistance of counsel. *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449 n. 14, 25 L.Ed.2d 763 (1970). The standard for determining whether a defendant was denied effective assistance of counsel has been set out in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 *reh'g denied,* 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984):

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687, 104 S.Ct. at 2064.

■ In evaluating counsel's performance under the first prong of the test, the appropriate standard is whether counsel's challenged conduct was reasonable judged on the facts of the particular case as of the time of counsel's conduct. *Id.* at 690, 104 S.Ct. at 2066. Nonetheless, any "[j]udicial scrutiny of [a] counsel's performance must be highly deferential." *Id.* at 689, 104 S.Ct. at 2065. An evaluating court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id., quoting Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955), *reh'g denied,* 350 U.S. 955, 76 S.Ct. 340, 100 L.Ed. 831 (1956).

■ Even where counsel's performance has fallen "outside the wide range of professionally competent assistance," *id.* at 690, 104 S.Ct. at 2066, a defendant must still overcome the second prong of the *Strickland* test by demonstrating that the counsel's errors and omissions resulted in actual prejudice to him. To make a threshold showing of actual prejudice, a defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068.

We are instructed that "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result

of the alleged deficiencies." *Id.* at 697, 104 S.Ct. at 2069. Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, ... that course should be followed." *Id.* We feel that course proper here.

In the present case Taylor's challenge to his counsel's performance claims these errors:

(1) Defense counsel waived peremptory challenges;

(2) Defense counsel did "not put in the time to prepare his case." Brief of Appellant at 8;

(3) Defense counsel failed to object "to essentially every exhibit offered by the prosecution, when there were very serious questions of foundation, hearsay and relevance as well being far beyond the scope of the indictment." *Id.* at 8–9;

(4) Defense counsel did not introduce the underlying documents attached to Rainbow's financial statement "which would have shown any prospective investor that title [to O.B. Oberhansly's land] was not in the name of Rainbow Mortgage yet, and would also show the complete picture of the present condition of the title to the property, so that there could be no question that no one was mislead by it." *Id.* at 10;

(5) Defense counsel failed to introduce documents showing Dyson's travel arrangements. These documents would have illustrated that the policy limiting expenditures of Gold 'N Health funds was established only after Taylor had received the investment funds;

(6) Defense counsel neglected to adequately impeach Dyson by showing, through use of Gold 'N Health check ledgers, that she received ten percent—more than $10,000 in total—of the investment funds she raised;

(7) Defense counsel failed to show that Beauty Lash and Sober–Up were part of "the big umbrella of Gold 'N Health, and not personal business ventures of Mr. Taylor." *Id.* at 11.

Any diversion of Gold 'N Health funds to Beauty Lash or Sober–Up, therefore, "were for the express and understood purpose, if not the actual legal arrangements, as part of Gold 'N Health companies...." *Id.*

We now analyze the claimed errors and the record.

## A. FAILURE TO EXERCISE PEREMPTORY CHALLENGES

■ Taylor's first claim—that he suffered prejudice because his counsel failed to exercise his peremptory challenges—seems incorrect from our reading of the record. At trial, Taylor received ten peremptory challenges and the government was given six. II R. 4. And while no record appears to have been made of either side's exercise of its peremptory challenges, the record suggests that Taylor's counsel used the vast majority of his peremptory challenges. Before the jury was seated, for instance, the following colloquy took place:

[TAYLOR'S COUNSEL] Your Honor, I'm going to waive any more peremptory challenges I may have.

THE COURT: All right.

[TAYLOR'S COUNSEL] Which is one or two more.

THE COURT: All right. I'll ask the clerk to read the names of the jurors and ask counsel to doublecheck to see that we can answer the question whether this is the jury that you agree has been designated.

II. R. 62. In other words, it appears from the scanty record that Taylor's counsel exercised eight or nine of his peremptory challenges, and waived one or two of them. Consequently, Taylor's assertion of prejudice arising out of his counsel's failure to exercise his peremptory challenges, is factually incorrect.

■ Moreover, a counsel's failure to exercise peremptory challenges does not give rise to a claim of ineffective assistance of counsel absent a showing that the defendant was prejudiced by his counsel's failure to exercise the challenges. *See, e.g., Mattheson v. King,* 751 F.2d 1432, 1438

(5th Cir.1985), *cert. dismissed,* 475 U.S. 1138, 1143, 106 S.Ct. 1798, 90 L.Ed.2d 343 (1986) ("[W]hile Mattheson complains that counsel failed to exercise any peremptory challenges, Mattheson does not identify the juror or jurors that should have been removed by counsel, nor alleges that any were unfavorably disposed to Mattheson."); *Crisp v. Duckworth,* 743 F.2d 580, 587 (7th Cir.1984), *cert. denied,* 469 U.S. 1226, 105 S.Ct. 1221, 84 L.Ed.2d 361 (1985) ("Crisp has not shown that he suffered any degree of prejudice ... [from defense counsel's failure] to challenge a single juror in a first degree murder trial...."). Here, Taylor has advanced no hypothesis—beyond a bald assertion that counsel's performance was inadequate—that would demonstrate a reasonable probability of prejudice arising from the failure to exercise all of the peremptory challenges. He has introduced no set of facts suggesting bias of one or more of the jurors; nor has he alleged that the panel was tainted by the intentional exclusion of a significant segment of the community. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

Finally, while we do not suggest that a counsel's failure to exercise any peremptory challenges may never give rise to a successful claim of ineffective assistance of counsel, the use of peremptory challenges to construct a fair and impartial jury panel will normally fall squarely within the realm of a tactical trial decision. Taylor fails to show prejudice from that decision here.

## B. FAILURE TO ADEQUATELY PREPARE CASE

Taylor's second ground for arguing that he was denied effective assistance of counsel is that his attorney was unprepared for trial. The only evidence advanced by Taylor, however, is his request on the first day of trial to "personally ... speak to the Court to explain that his attorney has not put in the time to prepare his case." Brief of Appellant at 8.

At the beginning of trial, Taylor sought and received an opportunity to speak with the court to request a continuance. From our reading of the record, however, it seems that Taylor was not motivated by a concern about his lawyer's performance. When Taylor's counsel informed the court that Taylor wished to "make a very brief statement to the court," II R. 67, the following dialogue ensued:

> THE COURT: Well, I don't know what the statement is about, if you represent the man and he's not dissatisfied with you as a lawyer, is he?
>
> [TAYLOR'S COUNSEL] No. He wants me to ask Your Honor for a continuance and ... he insists on making a statement, and if Your Honor deems it appropriate.

II. R. 68. During his remarks to the court, Taylor never suggested any dissatisfaction with his counsel. Rather, Taylor's request for a continuance appears to have been prompted by the trial court's ruling that a previous conviction of Taylor's—a 1977 second degree felony theft charge reduced to a Class A misdemeanor—would be admissible for impeachment purposes if Taylor testified:

> DEFENDANT: The thing I was looking at, it was—we prepared our case in regard to me being on the stand, and now [Taylor's counsel] suggests that I don't go on the stand at all, and if we don't present some of the things that are necessary to show the people and jury that what really is the facts, and that's the reason I didn't feel we were prepared.
>
> THE COURT: That's a decision you and your lawyer have to make. You have the absolute right to go on the stand; and no one is telling you not to.

II. R. 70.

In addition, even assuming that Taylor was dissatisfied with his counsel's performance, Taylor has pointed to no instances where counsel's purported lack of preparation "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland,* 466 U.S. at 686, 104 S.Ct. at 2064.[3] "[A]ctual ineffective-

---

**3.** To the extent that some of the specific errors   raised by Taylor can be viewed as resulting

ness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice." *Id.* at 693, 104 S.Ct. at 2067.

Finally, we note that the record fails to reflect a lack of preparation by Taylor's counsel. At trial, counsel's vigorous cross-examination of virtually all of the witnesses presented by the prosecution reflects an extensive understanding of Taylor's case. In addition, counsel advanced his own interpretation of the events at issue, and called several defense witnesses in Taylor's support. Similarly, counsel's closing argument demonstrated a clear understanding of the facts involved. He proposed instructions to the jury based on his view of the appropriate legal standard. As a result, we must conclude that Taylor has failed to "affirmatively prove" prejudice to him arising out of his attorney's lack of preparation of Taylor's case.

## C. FAILURE TO OBJECT TO EXHIBITS

The third basis for Taylor's claim of ineffective assistance of counsel arises from the attorney's failure to object to exhibits offered by the prosecution. Although Taylor asserts that counsel's omissions implicated "essentially every exhibit offered by the prosecution," Brief of Appellant at 8, he cites only three specific instances where allegedly inadmissible evidence was introduced without objection: the testimony and exhibits involving Lewis V. Nord ("Nord"); promissory notes given to investors and signed by Taylor; and exhibits concerning a loan to Rainbow.

### (1) *Testimony of Lewis V. Nord.*

■■■ Pared to its essentials, Taylor's objection to the testimony of Nord is that it was inadmissible because he was "not part of the indictment...." Brief of Appellant at 7. As a result, Nord's testimony resulted in a cumulative "parade of horribles (not found in the indictment) with lots of vic-

tims, losing lots of money." *Id.* Notwithstanding Taylor's assertion to the contrary, however, it is clear that because Nord was a victim of this scheme, although not identified in the indictment, his testimony and the related exhibits were admissible. *See United States v. Mancuso,* 444 F.2d 691, 695 (5th Cir.1971), ("Other transactions connected with the offenses charged have long been used to show a general pattern, the necessary criminal intent or the guilty knowledge of the defendant."). *Accord United States v. Fuel,* 583 F.2d 978, 988–89 (8th Cir.1978), *cert. denied sub nom. Greene v. United States,* 439 U.S. 1127, 99 S.Ct. 1044, 59 L.Ed.2d 88; *United States v. Cobb,* 397 F.2d 416, 417–18 (7th Cir.), *cert. denied,* 393 U.S. 924, 89 S.Ct. 255, 21 L.Ed.2d 260 (1968); *Stratton v. United States,* 387 F.2d 364–65 (10th Cir.1968); *Allen v. United States,* 289 F.2d 235, 236 (5th Cir.1961). If Taylor's objection is that the prejudice resulting from Nord's testimony outweighed its probative value, we cannot agree. "A trial court has broad discretion to determine whether the probative value of evidence outweighs the risk of evidence." *United States v. Primrose,* 718 F.2d 1484, 1492 (10th Cir.1983), *cert. denied,* 466 U.S. 974, 104 S.Ct. 2352, 80 L.Ed.2d 825 (1984). *Accord United States v. Cochran,* 499 F.2d 380, 388 (5th Cir.), *reh'g denied,* 502 F.2d 1168 (1974), *cert. denied,* 419 U.S. 1124, 95 S.Ct. 810, 42 L.Ed.2d 825 (1975). We find no abuse of discretion in the present case.

■■■ Finally, even assuming *arguendo* that Nord's testimony was inadmissible, we conclude that his evidence was merely cumulative. As such, its admission would have been harmless beyond a reasonable doubt. *See, e.g., Glazerman v. United States,* 421 F.2d 547 (10th Cir.), *cert. denied,* 398 U.S. 928 (1970).

### (2) *Promissory Notes.*

Taylor's second claim of prejudice arising from counsel's inaction involves the consistent failure of counsel to object on the basis

---

from his counsel's lack of preparation, it can be argued that he has in fact pointed to instances where counsel's performance resulted in actual prejudice to Taylor. Because Taylor has raised

these errors as direct evidence of prejudice rather than as evidence of lack of preparation, however, they will be addressed separately from his claim of counsel's lack of preparation.

of foundation to admission of the promissory notes given to investors. Specifically, Taylor argues that "the prosecution would ask, 'Who signed the note?' without even establishing a basis for the person knowing the answer." Brief of Appellant at 9.

■ Regardless whether the proper foundations were laid for admission of the promissory notes, Taylor's claim must be summarily rejected. Nowhere has Taylor contended—at trial or on appeal—that he did not in fact sign the notes. As a consequence, even if the promissory notes were inadmissible under the Federal Rules of Evidence without additional foundation, their admission cannot in any way be said to have "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686, 104 S.Ct. at 2064.

Moreover, counsel's reluctance to object to admission of the promissory notes appear to have been motivated by trial strategy rather than any lack of competence. Taylor's defense at trial was that Gold 'N Health failed because of inadequate management rather than any deceptive scheme. Therefore, he did not challenge the sequence of events, but rather, disputed only the government's interpretation of those events. To challenge the admission of the promissory notes because it was not shown that he had signed them when the fact that he had signed them was not in dispute, would seem to be a waste of effort. Consequently, Taylor's counsel's failure to challenge the promissory notes appears to have been the result of a conscious trial tactic rather than incompetence.

(3) *Exhibits Concerning the Bank Loan to Rainbow Mortgage.*

■ The final example put forward by Taylor as evidence of counsel's failure to object to the introduction of inadmissible evidence relates to exhibits concerning a bank loan granted to Rainbow. According to Mr. Greene, a mortgage banker at First Interstate Bank, First Interstate was forced to extend a loan of $8,489 to Rainbow in January 1984 to cover an overdraft

on its account. This evidence was clearly relevant to show Rainbow's true financial condition in 1984, as distinguished from the rosy picture portrayed by its financial statement. In support of Greene's testimony, two exhibits—Exhibit 24 and Exhibit 28—were introduced. Exhibit 24 was a signature card for Rainbow's account; Exhibit 28 was a copy of the promissory note for the loan at issue.

Although Taylor argues that he was prejudiced by counsel's failure to object to these exhibits, it is unclear on what ground the objection should have been based. It seems unquestionable that the documents were admissible as records of regularly conducted activity under Fed.R.Evid. 803(6). If Taylor's criticism is that the government failed to lay a proper foundation, we must reject his argument on the same basis on which we rejected his criticism of the promissory notes. Since Taylor has not asserted that the documents introduced were factually incorrect, their admission cannot have resulted in prejudice to him.

### D. FAILURE TO INTRODUCE DOCUMENTS ATTACHED TO RAINBOW'S FINANCIAL STATEMENT

■ Taylor argues that counsel seriously erred in failing to introduce the underlying documents that were attached to Rainbow's financial statement. Focusing upon the real estate owned by Oberhansly, Taylor contends that an asterisk followed the valuation with the words, "see appraisal." A reasonably prudent investor, he reasons, would have asked to see the appraisal. The appraisal would have disclosed the fact that the land was owned by Oberhansly rather than Rainbow, thus eliminating the alleged deception. As a consequence, he concludes, the attached documents would have clearly demonstrated that Taylor's listing of Oberhansly's real estate as an asset on Rainbow's balance sheet was not intentionally deceptive.

At the outset, it must be emphasized that Taylor has never come forward with the underlying documents that he claims would exonerate him. Indeed, even though Tay-

lor made the identical argument at the trial court hearing on the issue of ineffective assistance of counsel, and introduced the appraisal sheet, he failed to introduce the underlying documents. Consequently, Taylor's argument must fail. Since he has not proven that the documents would have a reasonable probability of exculpating him, he has not demonstrated that the failure to introduce them into evidence at trial resulted in any prejudice to him.

Even more fundamentally, Taylor's argument must be rejected out of hand. "[T]he scheme to defraud element required under section 1341 is not defined according to a technical standard." *United States v. Van Dyke*, 605 F.2d 220, 225 (6th Cir.1979). Rather, "[t]he standard is a "reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of society." *Id., quoting United States v. Bruce*, 488 F.2d 1224, 1229 (5th Cir.1973). To violate 18 U.S.C. section 1341, a misrepresentation need only be "reasonably calculated to deceive persons of ordinary prudence and comprehension." *Washita*, 789 F.2d at 814.

Despite Taylor's efforts to justify the financial statement, a jury could have found that its purpose, even with the alleged attachments, was to deceive the investors. It seems to us to be highly unusual to list property owned by an unaffiliated party as an asset on a corporate financial statement. The ordinarily prudent reaction, it seems clear, would be to impute ownership to the corporation. As Dyson testified when asked whether Taylor had ever discussed the connection between Rainbow and the real estate, "Well, I didn't ask for the connection. This is Rainbow Mortgage asset I assume. I assumed they owned it if it was on the balance sheet." III R. 102.

Moreover, it should be recognized that the asterisk could have been as easily intended to forestall inquiry as to stimulate it. The exact amount of the value attached to the land—$3,967,583.00 and the words "see appraisal"—could have been perceived as lending verisimilitude to the financial statement, rather than undermining it.[4]

We hold that Taylor has failed to demonstrate actual prejudice resulting from his counsel's failure to introduce the attachments to Rainbow's financial statement.

### E. FAILURE TO SHOW DYSON'S TRAVEL ARRANGEMENTS

Taylor next argues that ineffective assistance of counsel is proven by his counsel's failure to introduce documents showing Dyson's travel arrangements. In effect, Taylor's argument appears to be that the agreement to spend the funds raised from the twenty Gold 'N Health investors only on the marketing of Gold 'N Health was first established at a meeting of all the investors. That meeting took place just before Dyson traveled to Sacramento, California, the first leg of a marketing trip for Gold 'N Health. From Dyson's travel records, it can be seen that she flew to Sacramento on May 16, 1984. Therefore, the meeting had to have taken place in mid-May, 1984. By that time, all of the expenditures made by Taylor on Beauty Lash and Rainbow had occurred. Consequently, the Gold 'N Health money spent by Taylor on projects other than the marketing of Gold 'N Health were not in violation of any promise to the investors to limit expenditures of Gold 'N Health funds to the marketing of Gold 'N Health. Counsel's failure to introduce Dyson's travel arrangements, therefore, prejudiced Taylor as they would have shown that Dyson did not dissipate Gold 'N Health's funds in violation of an agreement between Taylor and the investors.

Despite the superficial logic of Taylor's argument, it must be rejected. Taylor's reasoning relies on two unsubstantiated assertions. First, Taylor contends that no agreement to spend Gold 'N Health funds existed until the meeting of the investors.

---

4. Evidence of this can be seen in testimony by one of the investors, Henry Norman Hayes. On cross-examination, Hayes was asked, "Did that give you any concern at all, the words, see appraisal?", to which he responded: "Not really any concern, no. I assume the appraisal would back up the figures on there." II R. 165.

Yet, a jury could easily have found that an agreement had been reached much earlier. At trial, Dyson testified that when she solicited the investors, she told them the money was to be used only for marketing:

Q. And did you tell [the investors] something about how the money would be used?

A. Yes. I told them that we were not raising $100,000 for the company because $100,000 was not enough to do this company, that this $100,000 was strictly for marketing so we could do it nationwide, so we could do it properly and it would be done right.

III R. 107. *See also* III R. 108–09. Dyson's testimony was confirmed by several of the investors. *See* II R. 90 (testimony of Donald N. Nish); II R. 130 (testimony of Sharon Jeppeson); II R. 140 (testimony of Lewis V. Nord); II R. 156 (testimony of Henry Norman Hayes).

In a similar fashion, Taylor's argument relies on a second unsupported assertion— that the meeting of the investors was held just prior to Dyson's trip to Sacramento. But Taylor has advanced no evidence to support this position. Moreover, at least three investors—Nish, Jeppeson, and Nord—testified that the investment meeting took place in March or early April. We feel that Taylor has failed to demonstrate any prejudice resulting from the exclusion of Dyson's travel records.

### F. FAILURE TO INTRODUCE GOLD 'N HEALTH CHECK LEDGER

■ The fifth error claimed by Taylor— that counsel failed to introduce the Gold 'N Health ledger—is untenable. According to Taylor, the ledger showed that more than $10,000 of the investment funds raised by Dyson were paid to her as a commission. This, presumably, would have discredited Dyson's testimony that the funds were to be used only for the marketing of Gold 'N Health. Therefore, its exclusion materially prejudiced Taylor.

Taylor's argument, however, ignores the fact that Dyson's ten percent commission on the funds she raised was fully explored in her cross-examination testimony:

Q. Were you paid 10 percent royalty or commission or anything of Gold 'N Health?

A. I expected to be paid 10 percent commission on this marketing money raised, but not 10 percent royalty on the product.

\* \* \* \* \* \*

Q. But if you were telling investors that there was money to be used exclusively for the expenses of Gold 'N Health, wouldn't that be an important thing to have said: Oh, except if you're talking investors, except for this 10 percent that I get?

A. Well, that's commissions and I'm raising money; that's not an unusual expense. It was on my budget as an expense. They could have seen it at any time.

III R. 153–54. *See also* III R. 162 (re-cross of Dyson). Since the information in the ledger was brought out at trial, no prejudice occurred to Taylor from counsel's failure to introduce the ledger.

### G. FAILURE TO SHOW CORPORATE STRUCTURE OF GOLD 'N HEALTH

■ Taylor's final claim of prejudice arises from his counsel's failure to introduce documents showing the corporate structure of Gold 'N Health. According to Taylor, the corporate structure of Gold 'N Health, as established, included the subsidiaries of Sober–Up and Beauty Lash. Funds expended on those projects, therefore, were in fact funds expended on Gold 'N Health. Because of counsel's failure to show this, Taylor contends, a false impression was created that Taylor "had been taking Gold 'N Health funds and diverting them into his personal business like Sober–Up and Beauty Lash." Brief of Appellant at 11. In reality, however, they were actually being expended on the Gold 'N Health corporation.

We are not persuaded. To begin with, Taylor has not introduced any evidence substantiating his claim that Sober–Up and Beauty Lash were subsidiaries of Gold 'N Health. Thus, he can show no prejudice arising from counsel's omission of the al-

leged evidence. More significantly, however, Taylor has failed to show a reasonable probability that a jury would have equated the expenditure of funds on Sober–Up and Beauty Lash with the expenditure of funds for the marketing of Gold 'N Health.

## IV. CONCLUSION

Accordingly, no reversible error has been demonstrated and the judgment is

AFFIRMED.